**AIRWELD, INC., Plaintiff,**

v.

**AIRCO, INC., Defendant.**

**Civ. No. 80–356–RE.**

United States District Court, D. Oregon.

Jan. 12, 1983.

barred by the intentional tort exception to the FTCA.

C. David Sheppard, Ferguson & Burdell, Seattle, Wash., Henry A. Carey, Portland, Or., for plaintiff.

Thomas M. Triplett, David W. Axelrod, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., W. Foster Wollen, Joan Caridi, Robert S. Fischler, Shearman & Sterling, New York City, for defendant.

## OPINION

REDDEN, District Judge:

Defendant Airco moves for judgment N.O.V. after a jury verdict against it on antitrust claims brought by plaintiff Airweld. I grant the motion on the grounds that the plaintiff's evidence was insufficient to support the verdict. In this opinion, I will briefly recount the relevant facts and law, and then indicate in my discussion of the evidence presented to the jury the crucial gaps in plaintiff's case.

## FACTS

Defendant Airco is a billion-dollar, multinational concern which manufactures gases for industrial use and sells them either to local distributors or directly to large customers. Plaintiff Airweld, which was formerly called Industrial Specialties Co. or ISCO, was the Portland distributor for Airco gases for many years prior to 1976, when their relationship ended and Airweld became independent.

This case was filed in the Western District of Washington in December of 1979 and transferred to this court where trial commenced in February of 1982. Plaintiff presented evidence for approximately two weeks. Defendant then argued for a directed verdict, and when this was denied, defendant also rested. At the time of the motions I indicated to the parties that I had serious concern about whether plaintiff had sustained its burden, but was submitting it to the jury so that they might affix a damage figure if they ruled in favor of plaintiff. The jury did return a verdict for plaintiff which, after trebling, totalled $1,139,799. This motion followed verdict.

Three of plaintiff's theories, or claims, were submitted to the jury. First, plaintiff claimed that defendant illegally tied the sale of its other gases to acetylene: i.e., that Airco forced Airweld to buy Airco acetylene in order to be an Airco distributor of other Airco gases. This claim was stated in terms of both an illegal tying arrangement, and an attempt to monopolize the Portland market for gases. For convenience, this first claim will be referred to throughout this opinion as "the acetylene claim."

Plaintiff's second claim was that Airco's participation in "swap agreements" with two other major gas distributors, Linde and Liquid Air, violated the Robinson-Patman Act's proscription of price discrimination, and was an attempt to monopolize. This will be referred to as the "swap" claim.

Plaintiff's third claim was that after Airco and Airweld ended their distribution agreement in 1976, Airco opened a competing Portland subsidiary, Airco Welding Supply or AWS, which used predatory pricing in its efforts to regain a market share for Airco gases. This will be referred to as the "predatory pricing" claim.

## THE STANDARD FOR JUDGMENT N.O.V.

In passing upon a motion for judgment N.O.V., the Court must give appropriate deference to the jury's verdict. The granting of such a motion is only proper "if, without accounting for the credibility of the witnesses, we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict." *William Inglis and Sons v. ITT Continental*

*Baking Co.,* 668 F.2d 1014, 1026 (9th Cir. 1981). The verdict of the jury must stand if it is supported by "substantial evidence." *Id.; Marquis v. Chrysler Corp.,* 577 F.2d 624, 631 (9th Cir.1978). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 853 n. 2 (9th Cir.1977); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The evidence in the present case fell short of this standard.

## THE ACETYLENE CLAIM

■ A major threat to plaintiff's acetylene claim was the statute of limitations. The customary limitation was tolled by a Federal Trade Commission proceeding, *In the Matter of Airco,* No. 9098 (1979). It commenced May 19, 1973 and encompassed conduct which dated back almost nine years from the time of this trial's commencement. That conduct was more than six years in the past when the complaint was filed in this action in February of 1979. Plaintiff was required to prove the coercive acts within this expanded limitation period. *See* Order of August 12, 1980, p. 2 (document # 24 in the file of this case).

The plaintiff did establish "substantial evidence" of an illegal tie *during the late 1960s.* During this period, Airweld sought to build its own acetylene plant but was dissuaded by Airco. A reasonable jury could have found that this was in fact coercion. But there was no substantial evidence of coercion during the required period of the statute of limitations.

The written contract between the parties does not include an illegal tie, and therefore the plaintiff must point to some occasion within the statutory period when coercion might be found by a jury to have occurred. Plaintiff points to a conversation in March 1973, which is *outside* the limitations period, *see* transcript at pp. 90–91. No discussion of the issue, which a jury could find to be "coercion," occurred until April of 1975, *after* Airweld had cancelled its contract with Airco. Airweld obviously could not be coerced by the threat of contract termination *after* it had terminated the contract on its own. Plaintiff proved that many conversations on this topic occurred prior to the limitations period, in the late 1960s and in 1971 and 1972. However, there was simply not substantial evidence of a tie during the limitations period. Judgment notwithstanding the verdict will be granted on the acetylene claim.

## THE "SWAP AGREEMENT" CLAIM

The three largest firms in the industrial gas field, Linde, Liquid Air and Airco, have national "swap agreements" designed to lower the transportation costs which are so large a part of the cost of industrial gases. This arrangement allows Airco to fill Linde's orders in the areas where Linde does not have its own plant, and Linde reciprocates by delivering gas to Airco customers in areas where Airco does not have a plant. The arrangement works, obviously, because all the products are gases which are identical in chemical composition and completely indistinguishable by brand name. The long-run goal of the swap arrangement is to have all trades come out even, but the arrangement also provides that, in cases of long-run imbalances, accounts will be settled through the use of a "settlement price." Plaintiff claims that the swaps are illegal under the Robinson-Patman Act's proscription of price discrimination, or under the proscription of an "attempt to monopolize" (the jury rejected the latter argument and therefore it need not be discussed here).

■ The "swaps" in this case are not subject to suit under the Robinson-Patman Act. There was no evidence that the "settlement price" was in fact the sort of "price" which could be compared to the higher price charged to Airweld by Airco. There was no evidence that the "settlement price" was in fact *ever* used by any party to settle accounts. This fact alone would require judgment N.O.V. in this case: plaintiff simply did not prove that others were in fact charged lower prices than those charged to it. However, even if this

fact had been proved, the swaps would not have been subject to attack under the Robinson-Patman Act. An inextricable part of the "settlement price" was the fact that each party to the agreement could count on the others to provide reciprocal "swaps" in their market areas. This is why the "settlement price" was so low. The parties to such an agreement could not be required under the Robinson-Patman Act[1] to give *others* the settlement price, who could not in fact "swap." In essence, the "swaps" were not sales, but trades—since Airweld could *not* trade, because it was in only one market, it sought to challenge the "swaps" as *sales* at a *price*. On this point I adopt the analysis of the Tenth Circuit in *American Oil v. McMullin*, 508 F.2d 1345, 1353 (10th Cir.1975), to the effect that such "swaps" are not "sales" within the ambit of the Robinson-Patman Act. To apply the Robinson-Patman Act blindly to such arrangements would not serve to advance legitimate goals such as the spurring of competition, but would merely preclude such arrangements and the beneficial effects they have in reducing transport costs of fungible commodities.

Judgment N.O.V. shall be entered in favor of the defendant on the "swaps" claim.

PREDATORY PRICING

After Airweld terminated the contract between the parties in 1975, effective in 1976, Airco was without a distributor of its products in the Portland market. In 1976, Airco opened a new subsidiary in Portland, Airco Welding Supplies (AWS), also called at times throughout the trial, "the company store." AWS tried to attract customers back to Airco products. Airweld claims that AWS used predatory pricing in this effort. The elements of such a claim are three: "(1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *Inglis, supra,* at

1027. I adopt the approach of *Inglis* at 1027–1039 to this difficult issue, and summarize the *Inglis* approach through the following quotations from that opinion:

The element of specific intent appears to have had its genesis in the distinctions—and similarities—between *monopolization* and *attempted monopolization*, both of which are proscribed in separate terms by section 2 .... Whatever its origins, the existence of specific intent may be established not only by direct evidence of unlawful design, but [also] by circumstantial evidence, principally of illegal conduct .... On the other hand, direct evidence of intent alone, without corroborating evidence of conduct, cannot sustain a claim of attempted monopolization ...

The third element, dangerous probability of success, like the first, also is rooted in the relationship between the separate offenses of monopolization and attempt to monopolize ... Although this element is generally treated as separate and independent, it can be inferred from evidence indicating the existence of the other two ... However, the proper significance of this third element 'has been controversial, even within this circuit.' ...

The conduct element of the attempt claim is also closely related to the other two elements .... But, in general, *conduct that will support a claim of attempted monopolization must be such that its anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. Such conduct is not true competition; it makes sense only because it eliminates competition ....*

Guided by these principles, we hold that to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on

---

1. My analysis is limited to the Robinson-Patman Act, 15 U.S.C. § 13, and nothing said here should be construed as foreclosing challenges to these arrangements under other appropriate statutes.

its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.

*Inglis, supra,* at 1027–1031; 1035–1036 (Citations omitted; emphasis added).

■ There was not "substantial evidence" of predatory pricing in this case. Plaintiff proved only that, of Airweld's 550 customers, AWS approached *17* over a period of four years with prices lower than Airweld's quotes.[2] Airweld then matched these Airco quotes, *and the transactions were still profitable ones to Airweld.* This is far from a case where pricing was below average variable cost or average total cost, as in *Inglis.* It appears that the entry of AWS into the Portland market merely reduced Airweld's profit margin on some orders. This is what competition, specifically price competition, is all about.

It is not surprising that AWS's quotes in these 17 instances were below those of Airweld. AWS was a new entrant in the Portland market, with no customers. Airweld held 23% of the Portland market. The only way AWS could enter the market was to compete on the basis of price. Further, Airweld's pricing policy was unusual. Airweld's President, Stan Richardson, believed that companies in the industrial gas field should *not* compete on price, but on

"service." "Service" consisted of the inculcation of customer goodwill through immediate personalized attention, frequent deliveries, and an intense sales effort. These efforts increase overhead and help explain why Airweld's prices were higher than AWS's and, in general, among the highest in the Portland market. Airweld's sales remained high, however, and the company was, and is, profitable. Airweld earned substantial profits even during the period of alleged "predatory" price cutting by AWS.

This is not substantial evidence of predatory pricing by AWS. This is not a pricing strategy which "makes sense only because it eliminates competition," *Inglis, supra,* at 1030–1031. This is the very essence of lawful competition. AWS entered a market in which profits were great, and its entry reduced profits to some extent. Indulging all reasonable inferences in favor of the plaintiff, I find the evidence falls short of proving that AWS engaged in predatory pricing rather than lawful competition.

The plaintiff's argument is that the prices quoted were below *AWS's* average total cost. This is not surprising. As a new entrant with no sales but high overhead, AWS was bound to lose money during its initial months of operation, when its sales volume was still low. *Inglis* obviously cannot be extended to such a situation, where AWS's prices would have been below average total cost, *whatever* it charged. A new entrant, *in order to compete,* must be willing to wait for sales to grow in order to recoup the initial investment. The prices AWS quoted were not so low that they made sense only if AWS's effort was to eliminate competition. In fact, they made more sense as attempts at lawful competition. Further, there was no "dangerous probability of success" in the

---

2. Plaintiff urged at oral argument that there was more evidence of predatory pricing which had *not* gone to the jury. This was apparently evidence that some Airweld customers switched to AWS, which plaintiff did not present to the jury because of "problems of proof." These problems appeared to be the fact that the customers switched, not because of price, but because they liked the AWS salesman better (i.e., "service"). It would obviously be speculation to attempt to say what this "evidence" would have proved. I know of no authority for upholding a jury's verdict based upon evidence which was *not* presented to the jury.

 

purported monopolization effort, as is required under the third prong of *Inglis. See Id.* at 1029. Airweld held 23% of the market. AWS had none of the market and gradually grew to be a very minor factor in it.[3] The idea that AWS was pricing low in order to monopolize the market, and that this purported scheme had a "dangerous probability of success," is unsupported by substantial evidence.

The defendant's motion for judgment N.O.V. on the predatory pricing claim will be granted.

---

**3.** In 1978 Airweld's gas sales were around $3,000,000, and AWS's were around $300,000. Nineteen seventy nine was the year in which AWS first earned a profit. Exhibit 239.