**AIRWELD, INC., Plaintiff-Appellant,**

v.

**AIRCO, INC., Defendant-Appellee.**

No. 83–3625.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 1984.

Decided Sept. 17, 1984.

---

David R. Lord, C. David Sheppard, Ferguson & Brudell, Seattle, Wash., for plaintiff-appellant.

T. Triplett, Schwabe, Williamson, Syatt, Moore & Roberts, Portland, Or., for defendant-appellee.

Before ANDERSON, POOLE and NELSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Airweld, Inc., a distributor of industrial gases, brought an action against Airco, Inc., a manufacturer of industrial gases, alleging a variety of antitrust violations including price discrimination, attempted monopolization, and tying arrangements. After a jury trial, the district court granted Airco's motion for judgment notwithstanding the verdict (j.n.o.v.). 576 F.Supp. 676 (D.Oregon 1983). Airweld appeals.

## I. BACKGROUND

### A. *Facts*

This action involves the industrial gas market in the Portland, Oregon area. Industrial gases are often divided into two types: "atmospheric" gases, such as hydrogen, oxygen, nitrogen, helium and argon; and "fuel" gases, such as acetylene and propane. Atmospheric gases are extracted from the atmosphere and generally fuel gases are produced through combining various elements or compounds. Industrial gases are generally sold in two forms. They are compressed into cylinders for resale by distributors and they are also sold in bulk, sometimes in liquid form, to larger industrial buyers.

In 1968, Stanton Richardson, who had been employed by Airco for 23 years, pur-

chased Industrial Specialties Co. (ISCO), an industrial gas and welding products distributor in Portland, Oregon. ISCO, now known as Airweld, Inc., had been a distributor of Airco, Inc. products since at least the early 1960's. Airco was, and apparently still is, one of the major manufacturers of industrial gas and welding products in this country. It has an acetylene plant in Portland and manufactures atmospheric gases in nearby Vancouver, Washington.

After Richardson's purchase, Airweld and Airco entered into a new distributorship agreement. The contract had a five-year term, but was terminable by either party upon one year's notice. At this time, Airweld became the sole distributor of Airco products in Portland and Airco ceased acting as its own distributor in that locale.

In 1973, a new three-year agreement was executed. Soon, however, Airweld became unhappy with Airco's price increases in argon and, on or before April 1, 1975, Airweld gave notice of its intent to terminate the atmospheric gas portion of the agreement. Negotiations to reconcile the differences failed and on March 31, 1976, the entire Airweld-Airco relationship ended.

### 1. Tying Claim Facts

In 1969, Airweld began to purchase acetylene from another manufacturer. When Airco learned of this, it told Richardson, Airweld's president, that it would terminate the agreement if outside purchases of acetylene continued. Airweld then resumed buying the gas from Airco. Airweld allegedly acquiesced because it did not feel it could economically secure another source of supply for atmospheric gases at economically feasible prices.

From 1969 to 1971, Rexarc, a manufacturer of acetylene plants, encouraged Richardson to build his own plant. Richardson was interested in this prospect because Rexarc was convinced that Airweld would save substantially on the cost of acetylene. Airco indicated to Richardson, however, that Airweld could not remain a distributor if it built its own plant. Airweld continued purchasing its acetylene requirements from Airco until the agreement terminated in 1976.

### 2. Price Discrimination Facts

Airweld's price discrimination claim involves agreements that Airco had with the Linde Division of Union Carbide Corp. and Liquid Air, Inc., two of the other major manufacturers of industrial gases in this country. Since at least 1968, Airco and Linde had a formal agreement to "swap" atmospheric gases on a national basis. For example, Linde did not have an atmospheric gas manufacturing plant in the Portland area prior to at least 1976. Airco would supply Linde with these gases from its Vancouver, Washington facility, and Linde made its gases available to Airco at its Indiana facility. Gas was traded only as available. Imbalances in the amount respectively received were to be kept within 50 million cubic feet, and only on a short term basis. Originally, imbalances were to be remedied solely through the provision of product. This changed, and in July 1974 through April 1976, "settlement values" were to be used. The settlement value was a trade price set for the particular gas.

In 1973, a similar, although less formal, agreement was entered between Airco and Liquid Air in which Airco agreed to supply Liquid Air with gas from Vancouver and Liquid Air made its gases produced in Phoenix available to Airco. Imbalances over one million cubic feet were to be rectified by use of a settlement price of $.080 per cubic foot.

Linde and Liquid Air each sold the atmospheric gases they received from Airco in the swaps in bulk to industrial users as well as to distributors in cylinder form. Airweld competed with Linde and Liquid Air to some extent in the bulk user market.

### 3. Attempt to Monopolize Facts

After Airweld terminated the distribution agreement, Airco decided to establish its own distributor in the Portland area, called Airco Welding Supply (AWS). Airco invested $400,000 to $500,000 in this opera-

tion. Since Airco was without any cylinder gas and hard goods customers in Portland after Richardson terminated the distribution agreement, AWS attempted to attract these customers back to using Airco products. It did this by approaching Airweld customers and offering lower prices. The evidence showed that at least some of the prices quoted by AWS were below its average total cost.

Airco also sought to obtain A & A Welding Supply, owned by Al Fick, as an Airco hard goods distributor for the Portland area. A & A was a relatively small distributor and it rejected Airco's proposals. Fick testified that Airco officials stated they were going to regain the market share lost when Airweld terminated the agreement. He also stated that Airco, through AWS, targeted his customers and offered them lower prices because he declined to become an Airco distributor.

Airweld also presented evidence that in the early 1970's, Airco encouraged it to distribute argon to "small bulk" customers. To service this need, Airweld invested in "stations" from which to supply the small bulk user. Airweld grew rapidly in this market and it became one of the most important facets of its business. By 1975, Airweld had begun to compete to some extent with Airco's bulk gas supplier in Portland, Airco Industrial Gases. Around that same time, Airco raised its prices on argon and this ultimately was the major reason Airweld decided to terminate the relationship. Richardson claimed that Airco was "squeezing" him out of the bulk argon business in the hope of taking over the accounts he had secured.

B. *Procedure*

Airweld filed this action on December 10, 1979. On August 12, 1980, the district court denied Airco's motion to dismiss the complaint based on the four-year statute of limitations, 15 U.S.C. § 15b, ruling that the

limitations period was tolled by a Federal Trade Commission proceeding against Airco instituted on May 19, 1977. Thus, the claims period was extended through May 19, 1973.

Airco's motion for summary judgment was denied on December 29, 1981, and the case proceeded to a two-week trial in February, 1982. A directed verdict by Airco at the close of plaintiff's evidence was denied. Airco elected not to present any evidence. On March 1, 1982, the jury returned special verdicts in favor of Airweld, finding that Airco had unlawfully engaged in a tying arrangement, price discrimination, and in an attempt to monopolize a portion of the industrial gas market. Judgment, with damages of $1,139,799 after trebling, was entered accordingly.

Airco then moved for judgment notwithstanding the verdict (j.n.o.v.) and/or a new trial. The j.n.o.v. was granted and the trial court also conditionally granted the new trial. Airweld appeals.

II. STANDARD OF REVIEW

 Our standard for determining the propriety of granting j.n.o.v. is the same as that used by the district court.[1] *See California Computer Products v. I.B.M. Corp.,* 613 F.2d 727, 734 (9th Cir.1979).

> [W]e must affirm the district court if, without accounting for the credibility of the witnesses, we find that the evidence and its inferences, considered as a whole and viewed in a light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict. Neither the district court nor this court is free to weigh the evidence or reach a result that it finds more reasonable as long as the jury's verdict is supported by substantial evidence.

---

1. The granting of a motion for new trial is subject to a less stringent standard. The trial court may order a new trial if it believes the jury's verdict is clearly against the weight of the evidence and we may reverse that decision only

if we find it to be an abuse of discretion. *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 1027 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1026 (9th Cir.1981), (citations omitted), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). Substantial evidence is more than a scintilla; it is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 853 n. 2 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

### III. THE TYING ARRANGEMENT [2]

■ A tying arrangement occurs when "a seller refuses to sell one product (the tying product) unless the buyer also purchases another (the tied product)." *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476, 1478–1479 (9th Cir.1983). Three primary elements establish a per se illegal tying arrangement:

(1) a tie-in between two distinct products or services; (2) sufficient economic power in the tying product market to impose significant restrictions in the tied product market; and (3) an effect on a not insubstantial volume of commerce in the tied product market.

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*, 732 F.2d 1403, 1407 (9th Cir.1984) (citing *Elaine Powers*, 708 F.2d at 1479); *see Jefferson Parish Hospital District No. 2 v. Hyde*, —— U.S. ——, 104 S.Ct. 1551, 1557–1561, 80 L.Ed.2d 2 (1984).

■ The courts have identified two other independent, but related, elements. First, the seller of the tying product must have an economic interest in the sale of the tied product. Second, there must be a showing that the seller of the tying product "coerced" to some extent the purchaser into buying the tied product. "Coercion occurs when the buyer must accept the tied item and forego possibly desirable substi-

tutes." *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir.1977). It may be shown directly through evidence that the purchaser was actually coerced, or indirectly "from a showing that an appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic power in the tying product market." *Id.* (citation omitted).

The district court granted Airco's motion for j.n.o.v. because there was no "substantial evidence of a tie during the limitations period." 576 F.Supp. at 678. The court reached this result despite its conclusion that Airweld offered substantial evidence of a tying arrangement during the late 1960's. What the court found lacking was evidence that during the claims period Airco coerced Airweld into purchasing acetylene because of its threats to discontinue supplying atmospheric gases. Not only must a defendant seek to require purchase of the tied item, it must have the power to do so. *Hyde*, 104 S.Ct. at 1558.

The gist of the district court's reasoning is that Airweld failed to prove a continuing antitrust violation. There is a four-year statute of limitations for antitrust claims. 15 U.S.C. § 15b. This action was filed on December 10, 1979. The district court ruled prior to trial that the four-year period was tolled by a Federal Trade Commission action against Airco, which extended the limitations period to May 19, 1973. The evidence showed that Airweld's tying claim accrued prior to May, 1973; Airco attempted to dissuade Airweld in the late 1960's and the early 1970's from either securing an alternative supply of acetylene or building its own plant. The court found, however, that no overt acts designed to enforce the tie occurred during the relevant portion of the claims period.

■ As a general rule, a cause of action accrues when a defendant commits an act

---

**2.** Airweld claimed that the tying arrangement violated both section 1 of the Sherman Act, 15 U.S.C. § 1, and section 3 of the Clayton Act, 15 U.S.C. § 14. This court has stated that the elements for establishing a violation under each provision are virtually the same. *Moore v. Jas.*

*H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir.1977); *see In re Data General Corp. Antitrust Litigation*, 490 F.Supp. 1089, 1100 (N.D.Cal. 1980) (the distinction has faded beyond recognition). In our analysis, therefore, we treat them alike.

that injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971); *In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68, 71 (9th Cir.), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). Since Airweld's tying cause of action first accrued under these general principles prior to the beginning of the limitations period, it had to rely on one of two doctrines. First, and primarily, Airweld argues that the continuing violation exception to the general rule of accrual applies. Second, Airweld relies on the related rule that a cause of action does not accrue on the date of injury if damages are speculative. *Id.*

■■■ The effect of a continuing violation is to restart the statute of limitations. In the context of a conspiracy to violate section 1 of the Sherman Act, the cause of action will begin to run anew whenever the defendant commits an overt act in furtherance of the conspiracy. *See Zenith Radio Corp.,* 401 U.S. at 338, 91 S.Ct. at 806. The cause of action may also reaccrue, in the absence of a conspiracy to violate the antitrust laws, when the defendant commits an act which by its nature is a continuing antitrust violation. *Kaiser Aluminum, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1051 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). An example of this latter type of continuing violation is when a defendant actively enforces an illegal contract. *Aurora Enterprises, Inc. v. National Broadcasting Co.,* 688 F.2d 689, 694 (9th Cir.1982) (citing *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1270 (9th Cir.1975)).

■■■ Importantly, for the cause of action to reaccrue Airweld was required to show Airco committed acts which not only caused it injury but also caused antitrust injury during the limitations period. *National Souvenir Center v. Historic Figures, Inc.,* 728 F.2d 503, 509 (D.C.Cir.1984); *Kaiser,* 677 F.2d at 1055; *Electroglas, Inc. v. Dynatex Corp.,* 497 F.Supp. 97, 105 (N.D.Cal.1980). In the context of a tying

arrangement, competitive injury is presumed when the elements discussed above are shown. *See Hyde,* 104 S.Ct. at 1556. Therefore, Airweld was required to show that Airco had the ability and actually did enforce the tie of acetylene to atmospheric gases during the claims period.

■■■ The parties agree that the contracts entered into are not illegal. The 1973 agreement involved requirements contracts for oxygen and acetylene in cylinders, and also provided for the supply of liquid argon, oxygen and nitrogen in bulk. In and of themselves, the contracts did not tie the sale of acetylene to the allegedly unique or desirable atmospheric gases. Therefore, Airweld's argument that it was injured and its cause of action accrued with each purchase of acetylene avails it nothing. Purchases under a legal contract do not constitute a "seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Hyde,* 104 S.Ct. at 1558. Certainly, the parties' voluntary conduct pursuant to the contracts does not involve "active enforcement of an illegal contract." *Aurora Enterprises,* 688 F.2d at 694.

■■■ Airweld also argues that, based on Airco's prelimitations period discouragement of Airweld's attempt to secure another source of acetylene, the jury could have inferred that it was coerced during the claim period. Again we disagree. While the district court focused on lack of evidence of acts of coercion during the claims period, what we find most critical is Airweld's failure to offer sufficient proof of Airco's *ability* to force Airweld to purchase its acetylene during the claims period. Coercion takes place in the context of power in the tying product market, not in a vacuum. *Hyde,* 104 S.Ct. at 1560–1561; *see Robert's Waikiki,* 732 F.2d at 1407. The record is virtually devoid of any evidence from which the jury could have found that Airco's posture in the atmospheric gas market in Portland was such

that it could require Airweld to purchase its acetylene. All the record shows is Richardson's equivocal statements that prior to 1973 Airco was the only supplier that he felt could economically provide atmospheric gases to Airweld in Portland. In particular, he stated that in 1969, Liquid Air, one of the two other manufacturers operating in Portland, probably could not have supplied him because Liquid Air was already buying some of its own supplies from Airco. He also stated that prior to 1973, Liquid Air indicated it would not be able to supply him. Finally, he testified that after he terminated the agreements with Airco in April 1975, he had not yet checked to see if alternative manufacturers would supply him. After the termination notice, he stated that Linde and, initially, Liquid Air indicated they would not be able to supply a full line of atmospheric gases. Air Products, another manufacturer, did, however, agree to replace Airco as Airweld's argon source. Soon, Liquid Air offered a full line of industrial gas to Airweld.

This evidence does not prove that Airco had a corner on the atmospheric gas market in Portland. For the jury to have concluded that it did was mere speculation, and the trial court was obligated not to sustain its finding. In fact, the evidence shows the atmospheric gas market in Portland was competitive. Once Airweld cut its ties to Airco, the other suppliers became available when they learned Airweld was now a serious customer.

■ Even assuming that Airco threatened to terminate the distribution agreement during the claims period does not, then, show that it forced Airweld into purchasing acetylene. A unilateral refusal to deal is not violative of the antitrust laws. *Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, 104 S.Ct. 1464, 1469,

79 L.Ed.2d 775 (1984). Airweld's evidence showed nothing more.

Airweld also argues that the speculative damage exception to the general rule of accrual applies. Assuming that Airweld offered sufficient proof of a tying arrangement imposed prior to 1973, it nonetheless is only entitled to damages for injury incurred during the claims period, May 1973 to May 1977. *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1361 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). If, as Airweld claims, it was injured with each purchase of acetylene, that injury was certainly complete when all the purchases of acetylene under the first agreement were consummated. That apparently would have been no later than April 1, 1973, when the second agreement went into effect. Airweld offered no proof that purchases of acetylene under the first agreement occurred after that time. In conclusion, we affirm the district court's j.n.o.v. on this claim.[3]

## IV. PRICE DISCRIMINATION

■ The district court also granted Airco's motion for j.n.o.v. on the price discrimination claim. Airweld had alleged that Airco's swaps of industrial gases with Linde and Liquid Air violated section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13, which prohibits discrimination "in price between different purchasers of commodities of like grade and quality." *See Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 547 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). A key requirement for a Robinson-Patman section 2(a) claim is a showing that there have been at least two completed, substantially contemporaneous sales by the same seller. *Id.; see Bruce's Juices, Inc. v. American Can Co.,* 330 U.S. 743, 755, 67 S.Ct. 1015, 1020, 91 L.Ed. 1219

---

**3.** Airweld also claims that the jury's verdict in Airweld's favor on the attempt to monopolize the acetylene market claim should still stand. We disagree. Attempt to monopolize will be discussed in more detail later in another context. At this point, we need only state that Airweld's failure to prove a substantive tying violation precludes it from claiming that Airco's actions in that respect also constituted an attempt to monopolize. *See Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 543 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).

(1947); *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 677 (9th Cir.1975).

■ The district court ruled that as a matter of law the swaps were not sales. In reaching its decision, it relied on the only decision of which we are aware that has held that exchanges of the same product are not sales within the ambit of the Robinson-Patman Act, *American Oil Co. v. McMullin,* 508 F.2d 1345, 1353 (10th Cir. 1975). In *McMullin,* the Tenth Circuit rejected the argument that an exchange of like types of gasoline between petroleum manufacturers constituted a sale, at least on the record before it. Nor can we, on this record, conclude that the exchange of fungible atmospheric gases by manufacturers are "sales."

Also, we agree with the district court's alternative holding that even if there were "sales," Airweld never actually proved discrimination in price. Airweld never proved when the sales actually occurred and therefore that they were contemporaneous to its purchases. Although it attempted to use the "settlement price" schedule to prove the price charged, Airweld never showed that the settlement price was ever used to settle accounts. We note further that because Airweld was not a manufacturer, it simply was in no position to swap. It could not offer Airco the same "price" as Liquid Air and Linde because it could not offer large quantities of gas at areas around the country where Airco did not have a manufacturing plant. It could not, therefore, offer the same consideration as Linde and Liquid Air. For these reasons, we conclude that the district court correctly granted Airco's motion for judgment notwithstanding the verdict on this claim.

## V. ATTEMPT TO MONOPOLIZE

The trial court also overturned the jury's finding that Airco attempted to monopolize the cylinder gas market in Portland. Airweld argues that substantial evidence was before the jury from which it could infer that Airco attempted to monopolize the market by trying to squeeze Airweld out of the bulk argon business and by Airco Welding Supply's below cost pricing.

■ There are three interrelated elements in an attempt to monopolize claim: "(1) a specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *William Inglis & Sons Baking Co.,* 668 F.2d at 1027.

■ In *Inglis,* the relationship of these elements was discussed in detail. *Id.* at 1027–1031. Conduct is the most critical element. Specific intent alone will not support an attempted monopolization claim. *Id.* at 1028. Predatory or anticompetitive conduct, however, can support an inference of specific intent and dangerous probability of success. *Id.* at 1028–1029.

Airweld argues that it offered adequate proof of Airco's intent to eliminate it as a competitor as discipline for the decision to terminate the distributorship agreement. In particular, Airweld points to evidence that shows Airco officials intended to "target" Airweld's accounts and to testimony that Airco officials stated Airco would get its share of the Portland marketplace back "any way it could."

This evidence is slim proof at best of specific intent to "destroy competition." Airco's desire to regain a share of the marketplace, and in so doing reduce Airweld's share, does not show an intent to interfere with the competitive process. As noted in *Inglis,* the "intent to vanquish a rival in an honest competitive struggle cannot help to establish an antitrust violation." 668 F.2d at 1028 (footnote omitted).

■ Our focus, then, must be on the sufficiency of Airweld's proof of unfair or predatory conduct. When, as here, evidence of specific intent is ambiguous, the "plaintiff must introduce evidence of conduct amounting to a substantial claim of restraint of trade or conduct clearly threatening to competition or clearly exclusionary." *Id.* at 1030 (footnote omitted).

[The conduct] must be such that its anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power. Such conduct is not true competition; it makes sense only because it eliminates competition. It does not enhance the quality or attractiveness of the product, reduce its cost, or alter the demand function that all competitors confront. Its purpose is to create a monopoly by means other than mere competition.

*Id.* at 1030–1031 (footnote omitted).

Airweld presented evidence which it argued showed that Airco encouraged it to enter the small bulk argon market and then attempted to "squeeze" it out and take over the accounts Airweld had secured. First, we fail to see how this evidence relates to Airweld's claim that Airco attempted to monopolize the cylinder gas market. Bulk argon is not sold in cylinders. This conduct also precedes the general time frame in which Airweld claims the attempt to monopolize occurred. Second, this is not conduct that amounts to "a substantial claim of restraint of trade" or that is "clearly threatening to competition or clearly exclusionary." *Id.* at 1030. Airco's price increases in the argon it sold to Airweld were not inherently anticompetitive. Airweld was not, as it seems to assert, locked into buying argon from Airco. After a price increase, Airweld had the right to shop the market to secure a better deal. If Airco failed to meet the lower price, Airweld could purchase from a new supplier.

Airweld also attempted to prove that Airco subsidized the AWS "company" store with up to $500,000 in order to enable it to engage in predatory below-cost pricing. Simply stated, "[p]ricing is predatory only where the firm forgoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits." *Id.* at 1031 (quoting *Janich Bros. v. American Distilling Co.*, 570 F.2d at 856).

This circuit has approved cost-based methods of determining when a price is predatory:

Costs are divided into *fixed costs* (those that do not vary with changes in output) and *variable costs* (which do so vary). *Total cost* is the sum of fixed and variable costs. *Marginal cost* is the increment to total cost that results from producing an additional unit of output. *Average cost,* or *average total cost,* is obtained by dividing total cost by output. Likewise, *average variable cost* is the sum of all variable costs divided by output. Average cost is thus higher than average variable cost for all output levels.

*Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1384–1385 (9th Cir.) (footnote omitted), *cert. denied,* —— U.S. ——, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *see Inglis,* 668 F.2d at 1033–1038.

If the plaintiff proves the prices charged by the defendant were below marginal cost or average variable cost, a prima facie case is made and the burden shifts to the defendant to show "that the prices were justified without regard to any anticipated destructive effect they might have on competitors." *Inglis,* 668 F.2d at 1036. If the price is above average variable cost, but below average total cost, the burden remains on the plaintiff to otherwise show the predatory nature of the pricing. *Id.* at 1036. This can be done if the evidence shows "that the defendant sacrificed greater profits or incurred greater losses than necessary in order to eliminate the plaintiff." *Id.; see Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 888 (9th Cir.1982), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Last, above average total cost pricing will sustain a monopolization claim only if the plaintiff offers "clear and convincing evidence ... that the defendant's pricing policy was predatory." *Transamerica Computer Co.,* 698 F.2d at 1388.

At trial, Airweld attempted to prove, through an Airco official's testimo-

**1194**

ny, that 47 of 50 prices offered to 17 Airweld customers were below Airco's average variable cost. On appeal, Airweld contends only that these price quotes were below *average total* cost. Airco argues that only a few of these price quotes were below average total cost.

Since below average total cost pricing does not prove Airweld's claim, Airweld was required to offer additional proof of anticompetitive conduct. *Zoslaw*, 693 F.2d at 888. In addition to its cost evidence, Airweld offered evidence to show that price competition was an unnecessary (and impliedly frowned upon) method of entering the Portland market; competition normally occurred in the area of services. The simple reason that most gas distributors in Portland engaged in only limited price competition does not mean, however, that it was an unfair means of competition for Airco to do so. If we held otherwise, it "would support the perverse rationale that a defendant may not compete by lowering its prices 'if competition would injure its competitors.'" *Id.* (quoting *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d at 742).

The other examples of anticompetitive conduct relied upon by Airweld do not aid its claim. The argon "squeeze" and targeting of customers have already been discussed. Neither of these practices is inherently anticompetitive.

Airco's conduct is most reasonably understood as a response to market conditions. Once Airweld terminated the distributorship agreement, Airco's presence in the Portland cylinder gas market was lost. In an effort to regain some or part of that market, it charged prices lower than Airweld, who had become one of its competitors. "[I]f market conditions are such that a course of conduct described by the plaintiff would be unlikely to succeed in monopolizing the market, it is less likely that the defendant actually attempted to monopolize the market." *Inglis*, 668 F.2d at 1030 (footnote omitted); *see Zoslaw*, 693 F.2d at 888. This is the situation here. Similarly, even if Airco's prices were below average

total cost, this is not the type of conduct "clearly threatening to competition or clearly exclusionary" which a plaintiff must prove in order to show that a firm without market power intended to monopolize the market. *See Inglis*, 668 F.2d at 1028. As Professors Areeda and Turner discuss, promotional below cost pricing may be a valid means for a firm to attempt to gain entry into a market. III P. Areeda & D. Turner, *Antitrust Law* ¶ 716 (1978).

For the foregoing reasons, we affirm the district court's j.n.o.v. on the attempted monopolization claim. Below average total cost pricing, without more, is not the kind of conduct that will support a finding of attempted monopolization by a firm without market power.

## VI. CONCLUSION

The judgment of the district court is AFFIRMED.