867 F.2d 270
 1989-1 Trade Cases 68,423
 CHIROPRACTIC COOPERATIVE ASSOCIATION OF MICHIGAN, Plaintiff-Appellant,
v.
AMERICAN MEDICAL ASSOCIATION; American Hospital
Association; Joint Commission on Accreditation of
Hospitals; Michigan State Medical Society; Munson Medical
Center; H. Doyl Taylor; Joseph A. Sabatier, Jr., M.D.; H.
Thomas Ballantine, M.D.; and James H. Sammons, M.D.,
Defendants-Appellees.
 No. 86-2093.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 8, 1988.
Decided Jan. 31, 1989.
 
 Paul A. Wright (argued), Romeo, Mich., for plaintiff-appellant.
 Thomas J. Tallerico, Detroit, Mich., William Tabor, Chicago, Ill., Douglas Carlson (argued), Jack Bierig, Chicago, Ill., Grady Avant, Jr., Detroit, Mich., James L. Simon, Chicago, Ill., Robert G. Cutler, William Sankbeil, Louis G. Corey, Julia A. Galante, Robert G. Kamenec, Detroit, Mich., for defendants-appellees.
 Before KEITH, WELLFORD, and NELSON, Circuit Judges.
 WELLFORD, Circuit Judge.
 
 
 1
 Plaintiff, Chiropractic Cooperative Association of Michigan ("CCAM"), is the assignee of a number of Michigan Chiropractors' antitrust claims and was formed for the express purpose of filing this lawsuit. In a complaint filed on July 7, 1983, CCAM charged the defendants with violating Secs. 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 and 2, by engaging in a concerted refusal to deal with chiropractors and by conspiring to monopolize the health care market. The defendants still remaining in the action are the American Medical Association ("AMA"), the American Hospital Association ("AHA"), the Joint Commission of Accreditation of Hospitals ("JCAH"), the Michigan State Medical Society ("MSMS"), the Munson Medical Center ("MMC"), and four individuals, H. Doyl Taylor, Joseph A. Sabatier, Jr., M.D., H. Thomas Ballantine, M.D., and James H. Sammons, M.D.
 
 
 2
 The district court granted each defendant's motion for summary judgment. The primary emphasis of the district court in making this disposition was upon withdrawal of a particular defendant or defendants from the conspiracy prior to the commencement of the four year statute of limitations prescribed by the Clayton Act. The district court further noted the lack of any overt act in furtherance of the conspiracy committed by a particular defendant during the limitations period. The defendants urge that we affirm the district court because they claim that CCAM had failed to produce evidence sufficient to raise a genuine issue of material fact concerning causation and injury. We affirm in part and reverse in part in respect to the different posture of the several defendants in respect to issues of withdrawal from the conspiracy, commitment of an overt act during the limitations period, and/or causation and injury to plaintiff's assignors.
 
 
 3
 In November of 1963, AMA authorized the formation of a Committee on "Quackery." Its "mission" was to be "the containment of chiropractic and, ultimately, the elimination of chiropractic." This committee was chaired by defendant Dr. Sabatier. Its members included defendants Drs. Ballantine and Taylor, the latter acting as Secretary.
 
 
 4
 From 1957 to 1980, Principle 3 of the Principles of Medical Ethics for AMA provided that:
 
 
 5
 A physician should practice the method of healing founded on a scientific basis; and he should not voluntarily professionally associate with anyone who violates this principle.
 
 
 6
 In 1969, an opinion of the AMA Judicial Council, which interprets the Principles of Medical Ethics, was published concerning chiropractic. The opinion labels chiropractic practice unscientific, implicitly invoking Principle 3 which made it unethical for a physician to associate with an unscientific practitioner. "Associating professionally" would include making referrals of patients to chiropractors, accepting referrals from chiropractors, buying diagnostic, laboratory or radiology services for chiropractors, teaching chiropractors, or practicing together in any form.
 
 
 7
 The activities of the AMA Committee on Quackery continued through 1974. In a status report from the Committee to the AMA Board of Trustees, dated January 4, 1971, the Committee reiterated its goal of elimination of chiropractic, indicating that it believed it was well along in its first mission of containment. The Committee further noted that the policy statement of AMA on chiropractic, adopted initially in 1966 and incorporated in the 1969 judicial opinion, had been a necessary tool with which the Committee had been able "to widen the base of its chiropractic campaign. With it, other health-related groups [were] asked and did adopt the AMA policy or individually-phrased versions of it. These comments, in turn, led to even wider acceptance of the AMA position."
 
 
 8
 Included among those health-related groups which adopted the AMA position was JCAH, which in 1964 viewed chiropractors as cultists and took the position that the performance of laboratory tests or the making of x-rays by its members for chiropractors would affect their accreditation. This JCAH viewpoint was allegedly published in an AHA newsletter. In addition, JCAH incorporated the AMA's "Principles of Medical Ethics" into its hospital accreditation standards in 1973. At the request of the AMA, the JCAH adopted Standard X which provided:
 
 
 9
 The governing body shall require that each member of the medical staff observe all the ethical principles of its profession. Failure by the medical staff and the governing body to take all reasonable steps to ensure adherence to these ethical principles shall constitute grounds for non-accreditation.
 
 
 10
 JCAH also wrote letters to hospitals during the early 1970's indicating that a loss or refusal of accreditation could result from a grant of privileges to a chiropractor.
 
 
 11
 MSMS also participated in the AMA action aimed against chiropractic. Its bylaws provided for adherence to the AMA Principles of Medical Ethics, including Principle 3, and in 1973, its House of Delegates adopted a resolution describing chiropractic as unscientific. The resolution informed the MSMS membership that it would be considered unethical for a doctor of medicine to refer a patient to a chiropractor.
 
 
 12
 The alleged participation by MMC in the alleged boycott centers upon that hospital's denial of staff privileges to Steven S. White, a chiropractor and one of CCAM's assignors, in June of 1978. The denial of privileges was based upon MMC bylaws, which incorporated AMA's Principles of Medical Ethics. MMC is one of the hospital facilities accredited by JCAH, and plaintiff alleges that MMC cooperated with JCAH in its efforts to exclude chiropractors in order to obtain, and also to maintain, its accreditation.
 
 
 13
 In 1976, a similar lawsuit was filed by several chiropractors in Illinois against AMA, AHA, JCAH, Taylor, Sabatier, Ballantine, Sammons, and others. Following a jury verdict in favor of the defendants, plaintiffs appealed the adverse judgment. The judgment was reversed and the case remanded in Wilk v. American Medical Association, 719 F.2d 207 (7th Cir.1983), cert. denied, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). The reversal was based upon a defect in the jury instructions regarding an analysis under applicable law of the plaintiffs' claims. On remand, the plaintiffs relinquished their claim for damages and a bench trial was conducted to determine whether the plaintiffs were entitled to equitable relief only. In an opinion published at 671 F.Supp.1465 (N.D.Ill.1987), District Judge Getzendanner found in favor of the plaintiffs on their claim against the AMA, but dismissed the plaintiffs' claims against the remaining defendants, some of whom remain defendants in the case under our present consideration.
 
 
 14
 Following the commencement of the Illinois lawsuit, AMA relaxed its standards and its positions against chiropractors. In a series of revisions to its Judicial Council's Opinions and Reports, AMA deleted the 1969 opinion and in its place substituted Sec. 3.60 and 3.70 in its published Opinions and Reports. As described by the court in Wilk:
 
 
 15
 Under these opinions, a medical physician could refer a patient to a "limited licensed practitioner" for diagnostic or other health care services. Although there was no express reference to chiropractors, chiropractors would fall within the definition of "limited licensed practitioners." Next, a medical physician could choose to accept or to decline patients sent to her or him by a licensed practitioner or by a layman. Finally, a medical physician could engage in any teaching permitted by law for which she or he is qualified. However, the relaxation of the right to refer patients was not without qualification. Opinion 3.60 specifically required that a medical physician should not refer a patient unless she or he is confident that the services provided on referral will be performed in accordance with accepted scientific standards. In addition, Opinion 3.01 provided that it is "wrong to engage in or aid and abet any treatment which has no scientific basis and is dangerous." Distribution of the revised opinions began in May of 1977. Principle 3 was still in effect.
 
 
 16
 671 F.Supp. at 1475.
 
 
 17
 In 1977, JCAH revised its standards to provide that medical staff membership should be limited to fully licensed physicians and dentists, unless otherwise provided by law. Also, all references to the AMA's Principles were deleted. In April of 1979, AMA and AHA entered into a settlement agreement in the case of Slavek v. American Medical Association, No. 77-1726 (E.D.Pa. Jan. 27, 1979). In that agreement, AMA affirmed that the term "licensed limited practitioners" in Sec. 3.70 of the AMA's Judicial Council's opinion and reports did include doctors of chiropractic. AHA, also a defendant in that lawsuit, affirmed that it had no policy with respect to whether or not its member hospitals or individual pathologists and radiologists employed by or associated with such hospitals could make x-rays or furnish clinical laboratory tests and reports to the chiropractors or chiropractic patients. That settlement agreement was published, but on a limited basis only.
 
 
 18
 In late July of 1979, the AMA House of Delegates adopted Report UU, which was described in Wilk as a "very begrudging change of position." 671 F.Supp. at 1475. Report UU reaffirmed "that a physician should at all times practice the method of healing founded on a scientific basis." Id. It allowed a physician, however, to refer a patient for diagnostic or therapeutic services to another physician, a licensed limited practitioner, or any other provider of health care services permitted by law to furnish such services. Report UU was designated as the position of AMA on chiropractic doctrine and relations between physicians and chiropractors. Principle 3, however, remained in effect.
 
 
 19
 In the early 1980's, MSMS officially revised its position with regard to chiropractors. However, no action, pursuant to its previously passed resolution, has been formerly taken since 1976, when it adopted AMA principles. JCAH undertook revisions of its accreditation standards in 1983 to allow each hospital, through its own governing body, to decide for itself, under applicable state law, which licensed health care providers would be allowed hospital privileges and membership on the medical staff. In their final form, the revised standards also included an AMA recommended provision for a medical physician dominated executive committee to make recommendations to the hospital's governing board for its approval of credentials, membership on the medical staff, hospital privileges, delineations, and structure of the medical staff. Also, in 1983, MMC reaffirmed its denial of Dr. White's request for staff privileges.
 
 I. American Medical Association (AMA)
 
 20
 AMA contends that any illegal boycott of chiropractors ended in 1977 by virtue of the publication of Secs. 3.60 and 3.70 of the Opinions and Reports. It asserts that these sections of the Judicial Opinions together with the 1978 Slavek settlement "are affirmative acts of the AMA evidencing the cessation of activities of which plaintiff complained." (AMA brief at 22.) It further asserts that no overt act was committed by AMA following these events in 1977 and 1978 in furtherance of the alleged conspiracy, and therefore any illegal activities by AMA fall outside the Clayton Act four year statute of limitations.
 
 
 21
 "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." United States v. United States Gypsum Co., 438 U.S. 422, 464-65, 98 S.Ct. 2864, 2887-88, 57 L.Ed.2d 854 (1978). The burden of proof is upon the defendant to demonstrate withdrawal from the conspiracy. United States. v. McLernon, 746 F.2d 1098, 1114 (6th Cir.1984).
 
 
 22
 AMA's activities in the late 1970's could be construed by a reasonable trier of fact as withdrawal from the conspiracy, but the evidence presented, even if uncontradicted, does not, in our view, firmly establish such a withdrawal. As noted by the district court in Wilk, the AMA's activities in the late 1970's prior to its elimination of Principle 3 were ambiguous and equivocal at best with respect to chiropractors. No widely published statement directly addressing the issue in unambiguous terms was made by the AMA to remedy the effects of its decade-long action against recognizing or dealing with chiropractors as medical practitioners. The district court in Wilk also determined that the boycott did not end until the elimination of Principle 3 in 1980. It is not clear that a reasonable trier of fact could not conclude that the AMA's activities until 1980 at the earliest did not effectuate a withdrawal under the United States Gypsum Co. standards.
 
 
 23
 The AMA also argues that even if it did not withdraw from the conspiracy, it committed no overt act within the limitations period and that it cannot be held liable for "the abatable but unabated inertial consequences of some pre-limitations action." Barnosky Oils, Inc. v. Union Oil Company of California, 665 F.2d 74, 81 (6th Cir.1981) (citing to Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117, 128 (5th Cir.1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976)). Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), holds that in the context of a continuing conspiracy, the statute of limitations runs from the commission of the act that causes the plaintiff's damage. See also Airweld, Inc. v. Airco, Inc., 742 F.2d 1184, 1190 (9th Cir.1984), cert. denied, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985). There still remains the question whether a reasonable trier of fact could conclude that Report UU, adopted by the AMA in late July of 1979, just after the commencement of the limitations period, continued the alleged conspiracy against chiropractors by virtue of its invocation of Principle 3, which was still in force.
 
 
 24
 AMA also contends that plaintiff presented no evidence to raise a genuine issue of material fact with respect to antitrust injuries or damages caused by the AMA's conduct. As Wilk points out, FTC v. Indiana Federation of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), supports the application of the rule of reason to this case. "Under the rule of reason, the inquiry mandated is whether the challenged agreement is one that promotes competition or one that suppresses competition. National Society of Professional Engineers v. United States, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1975)." 671 F.Supp. at 1470.
 
 
 25
 We cannot at this juncture agree with the district court that plaintiff, as a matter of law, has failed to show antitrust injury with respect to AMA, since that defendant itself acknowledged, even as far back as 1968, that "[t]he facts are that chiropractic has not grown in number under existing policy, whereas there is every evidence to believe that it would grow if AMA policy decisions were relaxed." AMA considered chiropractors a competitive threat, although they may well have also thought them to be unscientific in their approach and unsuitable medical practitioners. We conclude that there is a material issue of fact presented by the evidence with regard to plaintiff's contentions about AMA.
 
 
 26
 Under antitrust law, individual chiropractors themselves must have suffered some injury caused by AMA's illegal acts for there to be a valid cause of action. AMA denies that any problems the individual chiropractors may have had with medical physicians arise out of the general distrust of chiropractic among medical physicians. AMA contends that refusals by hospitals to grant access to CCAM members were based upon independent and legitimate reasons. AMA argues that the affidavit of Dr. Miron Stano, relied upon by plaintiff, is inadequate to rebut AMA's evidence that the individual chiropractors have obtained certain hospital privileges and have experienced a rise in income during the course of the AMA attempted boycott.
 
 
 27
 Plaintiff's proof on the issue of individual damages is weak, but individual chiropractors do claim to have suffered a loss of reputation as a result of the acts of the AMA. The fact that their incomes increased over the course of time does not in and of itself defeat a conclusion that these chiropractors suffered damage. They may have earned much more had AMA not taken the actions in dispute and labeled them as the members of an unscientific cult. There is evidence in the record of certain individual chiropractors being denied staff privileges in Michigan hospitals. There is, then, sufficient evidence and dispute with regard to material facts to enable plaintiff to survive AMA's summary judgment motion. AMA is entitled to make its argument that any injury to plaintiff and its assignors was really caused by public disbelief in the principles of chiropractic and that the AMA was simply engaged in free speech. We reverse the grant of summary judgment to AMA.
 
 
 28
 II. Joint Commission on the Accreditation of Hospitals (JCAH)
 
 
 29
 JCAH has demonstrated its withdrawal from the conspiracy in 1977 in our view when it revised its standards to both delete references to the AMA's Principles and to allow that a medical staff membership could be composed of other than physicians and dentists if allowed by law. At that point, hospital medical staffs no longer were forced to comply with the AMA Principle against association with chiropractors in order for the hospital to obtain accreditation. Although in fact JCAH standards continued, apparently, to limit staff privileges to physicians and dentists, it provided that other health care providers could obtain a position on a medical staff if allowed by state law. In its only contact with a Michigan hospital following the commencement of the limitations period, the JCAH referred the hospital to its 1977 standard and to Michigan law. We therefore affirm the grant of summary judgment to JCAH.
 
 III. American Hospital Association (AHA)
 
 30
 AHA has established without substantial dispute that it withdrew from the conspiracy when it entered into the Slavek settlement in 1979, more than four years prior to this suit. In any event, there is no evidence of any act committed by the AHA against chiropractic brought forward by plaintiff, nor any showing of reaffirmation of its previous policies in effect prior to 1979 against chiropractic within the statute of limitations period. Summary judgment granted to AHA therefore was appropriate.
 
 IV. Michigan State Medical Society (MSMS)
 
 31
 The affidavit of Robert M. Leitch, M.D., Secretary of MSMS, avers that "as of September 1976, all activities conducted by MSMS regarding the practice of chiropractic, pursuant to previously passed resolutions or otherwise, including all activities previously undertaken by the MSMS Committee on Chiropractic, were terminated...." Despite this sworn assertion, there is evidence that the MSMS policy against chiropractic was reaffirmed after 1979. In an MSMS memo dated December 23, 1981, a member of the MSMS staff, giving notice to a subcommittee to review the MSMS policy on chiropractic, attached to her memo a statement of the MSMS policy on chiropractic which "reaffirms the belief that the practice of chiropractic is an unscientifically proven cult of the healing arts, and ... opposes any advertising by chiropractors claiming the cure or prevention of diseases of known organic cause." This constitutes at least some evidence upon which a reasonable trier of fact might conclude that MSMS affirmatively restated its continuing policy against chiropractors after the 1979 limitations period.
 
 
 32
 Our discussion of antitrust injury, causation, and injury to the individual chiropractors set forth above in the section concerning the AMA is applicable here to MSMS. It would logically follow that our reasoning with respect to potential liability would also apply to this defendant.
 
 
 33
 We conclude that summary judgment was inappropriate as to MSMS.
 
 V. Munson Medical Center (MMC)
 
 34
 We also conclude that summary judgment in favor of MMC was inappropriate. As late as September 30, 1980, John C. Bay, President of MMC, wrote the administrator of a community health center in Michigan stating that MMC did not provide ancillary services to chiropractors nor would MMC send patient records or x-ray films to a chiropractor.
 
 
 35
 In addition, MMC's reaffirmation of its refusal to deal with Chiropractor Stephen White in 1983 may constitute an overt act within the statutory period under Barnosky, supra. That Dr. White apparently sought privileges at MMC again in 1983 just prior to the filing of this lawsuit, and perhaps even for the purposes of instituting this suit against MCC, is not material.
 
 VI. The Individual Defendants
 
 36
 We deem that summary judgment against the individual defendants, however, was clearly proper. The involvement of these individuals with the alleged conspiracy effectively ceased as of the disbanding of the Committee on Quackery in 1974. In fact, Taylor, Sabatier, and Ballantine are no longer associated with AMA and have not been since the mid-1970's. While Sammons continues to be associated with AMA as an executive vice president, there is no material or substantial evidence that he has been instrumental in any way since the mid-1970's in AMA's policy towards chiropractic. His actions are not demonstrated to have been a basis of the antitrust conspiracy alleged nor a proximate cause of any demonstrated injury within four years of the filing of this suit.
 
 
 37
 Accordingly, we find no error in the grant of summary judgment to each of the individual defendants.
 
 VII. Patient Care Defense
 
 38
 On June 24, 1985, the district court denied plaintiff's motion to strike the affirmative defenses asserted by certain defendants of public interest and patient care and to exclude all evidence in relationship thereto at trial. 617 F.Supp. 264 (E.D.Mich.1985). Since plaintiff has not specifically appealed this ruling on the issue of the "patient care" defense, we decline to decide this issue although it has been briefed by the parties.
 
 
 39
 The district court, in denying plaintiff's motion to strike and motion in limine, rejected plaintiff's contention that a per se rule of illegality applied to the instant case and rendered irrelevant any "public interest" or "patient care" justifications advanced by defendants. The district court concluded that Rule of Reason analysis was applicable in this case, and that considerations of public interest and patient care were relevant in applying the Rule of Reason where anticompetitive effect was not clearly established.
 
 
 40
 As noted by the district court, and by the Seventh Circuit in Wilk, 719 F.2d at 225, the Supreme Court in its seminal opinion of Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), included in its classic statement of the Rule of Reason factors to be considered in determining the ultimate issue of "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." 246 U.S. at 238, 38 S.Ct. at 243. Those factors include
 
 
 41
 [T]he history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, [and] the purpose or end sought to be attained.... This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
 
 
 42
 246 U.S. at 238-39, 38 S.Ct. at 243-44. The district court on remand should consider these factors in light of the more recent Supreme Court decisions in F.T.C. v. Indiana Federation of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), and National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).
 
 
 43
 We therefore AFFIRM the district court's grant of summary judgment with respect to defendants JCAH, AHA, Taylor, Sabatier, Ballantine, and Sammons. We REVERSE, however, with respect to defendants AMA, MSMS, and MMC, and REMAND for further proceedings in accordance with this opinion.