851 F.2d 271
 RICO Bus.Disp.Guide 6981, 26 Fed. R. Evid. Serv. 55
 BENEFICIAL STANDARD LIFE INSURANCE COMPANY, Plaintiff-Appellee,
v.
Robert MADARIAGA, et al., Defendants-Appellants.
BENEFICIAL STANDARD LIFE INSURANCE COMPANY, Plaintiff-Appellee,
v.
William GRAHAM, Defendant-Appellant,
and
Robert Madariaga; Ronald Barker; Barry L. Treash, Defendants.
 Nos. 86-6616, 86-6668.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 5, 1988.
Decided July 6, 1988.
 
 Thomas R. Sheridan and Michael R. Rogers, Los Angeles, Cal., Wilfred A. Hearn, Jr., Washington, D.C., for defendant-appellant Robert Madariaga.
 Robert M. Aran, Sherman Oaks, Cal., for defendant-appellant William Graham.
 Richard L. Fruin, Jr. and Mark S. Lee, Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, FARRIS and LEAVY, Circuit Judges.
 FARRIS, Circuit Judge:
 
 INTRODUCTION
 
 1
 This appeal from a summary judgment is brought by two of the four defendants in a civil RICO action. Beneficial Standard Life Insurance Company brought suit in 1985 against, inter alia, former vice-president Barry Treash and business associates Robert Madariaga and William Graham, with whom Treash had contracted on behalf of Beneficial. The civil suit followed the criminal trial and conviction of Treash for mail fraud and income tax evasion in connection with the schemes alleged in Beneficial's complaint. The district court entered summary judgment against only Madariaga and Graham, assessing joint and several liability of $2,400,000.
 
 
 2
 On appeal, they claim that: (1) there was a genuine issue of material fact as to whether the statute of limitations ran before Beneficial filed suit; (2) they were entitled to a jury trial on whether they had the requisite intent to defraud under the RICO statute and state laws; and (3) they were denied a meaningful opportunity to conduct discovery. Graham also raises several challenges to the damage award.
 
 
 3
 We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 and Fed.R.App.P. 4(a)(1) & (2). We reverse in part and affirm in part.
 
 BACKGROUND
 
 4
 From August, 1979 to September, 1980, Barry Treash was a vice-president of Beneficial in charge of data processing and management information. Treash conducted the negotiation, analysis and approval of decisions and agreements to acquire computer-related materials and services for Beneficial. Among the suppliers with whom Treash entered into contracts were Robert Madariaga and William Graham, the owners of two companies--California Computer Resources, and Management and Marketing Consultants--that provided computer-related services.
 
 
 5
 It is undisputed that in 1980, Beneficial became suspicious of Treash's activities. Madariaga claims that these suspicions were aroused as early as March of that year, while Beneficial contends that its suspicions began in June when it received a tip from a competitor about Treash's possible involvement in a kickback scheme with an outside vendor named Manthorne. According to Madariaga, Beneficial began its investigation of Treash and the two companies in March, 1980, and on June 11, 1980, Beneficial's internal auditor reported that the contracts in question were made with inadequate or no competition. Beneficial claims that the internal audit did not find any evidence of conflict of interest, fraud or wrongdoing on Treash's part.
 
 
 6
 In the summer of 1980, Beneficial called upon its private investigator to conduct an outside probe of Treash which, Beneficial alleges, failed to uncover evidence of improprieties on Treash's part.[1] Nonetheless, Beneficial asked for Treash's resignation on September 2, 1980. Beneficial maintains that it did so because Treash "was insufficiently attentive to costs and corporate procedures" and because of "his abrasive personality," in addition to the "unproven rumors ... concerning the contracts." Madariaga contends that Beneficial knew the details of Treash's questionable deals and threatened to expose them to law enforcement authorities unless he resigned. Madariaga points to a memorandum written by Beneficial's head auditor, David Einhorn, who attended the meeting at which Treash was terminated, as support for these assertions.
 
 
 7
 Following Treash's resignation, Beneficial renegotiated its unfavorable contracts with defendants. Madariaga and Graham continued to provide computer-related services to Beneficial through 1981.
 
 
 8
 In July of 1982, a federal grand jury subpoenaed all of Beneficial's cancelled checks to Treash. Beneficial claims that it assumed at the time that Treash was being investigated for income tax evasion. Madariaga claims that because Beneficial received a Grand Jury subpoena and not an Internal Revenue subpoena, it must have known that Treash was under investigation for "the kickbacks which Beneficial suspected Treash had received from vendors."
 
 
 9
 Treash was indicted and, on July 24, 1984, convicted of twelve counts of mail fraud and three counts of income tax evasion in connection with his activities at Beneficial. Madariaga and Graham testified without immunity at the criminal trial.
 
 
 10
 On July 23, 1985, Beneficial filed a civil action against, inter alia, Treash, Madariaga, and Graham. The complaint for damages against Madariaga and Graham was based on a federal theory, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961 et seq., and two state causes of action arising under California common law, Fraudulent Misrepresentation and Concealment, and Money Had and Received. The complaint alleged that defendants defrauded Beneficial through a scheme by which Madariaga and Graham entered into contracts with Beneficial at inflated rates and for nonexistent services in return for bribes or kickbacks to Treash of 50 percent of their profits.[2] According to the complaint, Madariaga and Graham were culpable for devising and carrying out this fraudulent scheme "by means of making materially false and fraudulent representations and promises to plaintiff, as well as by concealment and nondisclosure of material facts...."
 
 
 11
 Madariaga entered his first appearance in the case on October 30, 1985 and began discovery in February, 1986. Graham, who did not enter an appearance until March 31, 1986, claims that he was not privy to any discovery conducted before his appearance. This claim is disputed by Beneficial, which points out that until April 15, 1986, Graham was represented by Madariaga's counsel. According to Beneficial, Graham was privy to all discovery taken in this case.[3] On April 15, Graham substituted new counsel because of a conflict of interest; the new counsel's appearance was filed on April 22. In May of 1986, Graham, through this new counsel, declined Beneficial's offer of a copy of the Treash trial transcript.
 
 
 12
 Discovery continued throughout the summer of 1986.[4] Beneficial moved for summary judgment against Madariaga and Graham on September 5. Beneficial stipulated with Madariaga and Graham to continue the hearing on the motion until a mandatory settlement conference on October 20. On that day, the court granted Beneficial's motion for summary judgment. Defendants' motion for reconsideration was denied on December 8. The amended judgment was entered on December 29. The district court allowed defendants to file an amended notice of appeal on February 17, 1987.
 
 I. STATUTES OF LIMITATIONS
 A. The Applicable Statute
 
 13
 The parties argue at length over the proper statute of limitations[5] to be applied to the RICO claim.[6] Both sides acknowledge that Agency Holding Corp. v. Malley-Duff & Associates, --- U.S. ----, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), may have resolved this dispute. That case held that all civil RICO actions will hereafter be governed by 15 U.S.C. Sec. 15b. That statute governs if Agency Holding applies retroactively.
 
 
 14
 The retroactive application of statutes of limitations is governed by Gibson v. United States, 781 F.2d 1334, 1338-40 (9th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987), and Rivera v. Green, 775 F.2d 1381 (9th Cir.1985), cert. denied, 475 U.S. 1128, 106 S.Ct. 1656, 90 L.Ed.2d 198 (1986). The Gibson court summarized the rule of those two cases: retroactive application is permitted when it would have the effect of lengthening, but not when it would shorten, the limitations period. 781 F.2d at 1339.
 
 
 15
 The parties disagree on which of two statutes of limitations would apply if Agency Holding does not control. The district court assumed, and Madariaga argues, that the three-year period of California Code of Civil Procedure Sec. 338 would apply. Beneficial contends that Cal.Code of Civ.Proc. Sec. 340.3, which runs only one year but would not accrue until the criminal conviction of Treash, should govern.
 
 
 16
 The district court was correct. We held, in a decision abrogated by Agency Holding, that section 338 was the California period of limitations for state claims most analogous to civil RICO suits. Compton v. Ide, 732 F.2d 1429, 1433 (9th Cir.1984). There is no support in Compton for applying a different statute of limitations in civil RICO suits that follow felony convictions. See id. Moreover, Cal.Code of Civ.Proc. Sec. 340.3 does not appear to apply to unindicted co-conspirators. See Cal.Code of Civ.Proc. Sec. 340.3 (prescribing period of limitations "in any action for damages against a defendant based upon such person's commission of a felony offense for which the defendant has been convicted ") (emphasis added).
 
 
 17
 Because the three-year period would apply if Agency Holding did not govern, the effect of retroactive application would be to lengthen the period. Therefore, under Rivera, retroactive application of the statute of limitations authorized by Agency Holding is proper, and the four-year period applies in this case.
 
 B. Accrual
 
 18
 Agency Holding explicitly left open the question of when RICO claims accrue. 107 S.Ct. at 2767. Before Agency Holding, the general federal rule was "that the limitations period begins to run when the plaintiff knows or has reason to know of the injury which is the basis for his action." Compton, 732 F.2d at 1433. This rule was in force when the district court ruled on the summary judgment motion. There is a question, however, whether this rule or the accrual rule applicable to antitrust suits should now apply. In other actions governed by 15 U.S.C. Sec. 15b, the plaintiff's knowledge is generally irrelevant to accrual, which is determined according to the date on which injury occurs. Airweld, Inc. v. Airco, Inc., 742 F.2d 1184, 1189-90 (9th Cir.1984), cert. denied, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985). Unless the statute was tolled, the knowledge-based rule of Compton would bar Beneficial's suit if it knew or should have known about its claims before July 23, 1981. If the antitrust rule applies, Beneficial may only recover for injuries suffered after July 23, 1981, unless the "continuing wrong" doctrine or a tolling rule applies.
 
 
 19
 1. Which Accrual Rule?
 
 
 20
 State Farm Mutual Automobile Ins. Co. v. Ammann, 828 F.2d 4 (9th Cir.1987), decided after Agency Holding, sheds light on which rule should apply. In State Farm, the district court had applied the three-year period prescribed in Compton; we remanded for reconsideration under the four-year statute of the Clayton Act. Id. at 4-5. In so doing, we held that the Compton rule still applies. Then-Judge Kennedy added in his concurrence that a new cause of action could accrue during the limitations period if new overt acts occur. Id. at 5 (Kennedy, J., concurring).
 
 
 21
 Applied to this case, these principles require the conclusion that the four-year statute of limitations period accrued when Beneficial had actual or constructive knowledge of the fraud, unless the statute was tolled. Beneficial may not recover for acts before July 23, 1981 if it had "knowledge" before that date. It may recover for new injuries inflicted within four years after accrual.
 
 
 22
 2. When Did the Action Accrue?
 
 
 23
 The district court held that Beneficial did not acquire knowledge of the fraud until Treash's conviction in July, 1984. Defendants claim that they raised a triable issue of fact as to whether Beneficial knew or should have known about the schemes when it investigated and terminated Treash in 1980.
 
 
 24
 We review the grant of summary judgment de novo, viewing the evidence in the light most favorable to Madariaga and Graham. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986). If a jury could reasonably have found for the nonmoving party, summary judgment was inappropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." 106 S.Ct. at 2514. Such facts need not be admissible as evidence at trial and may be "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves...." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986).
 
 
 25
 Ordinarily, we leave the question of whether a plaintiff knew or should have become aware of a fraud to the jury. Kramas v. Security Gas & Oil Inc., 672 F.2d 766, 770 (9th Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982); see also S.E.C. v. Seabord Corp., 677 F.2d 1297, 1298-99 (9th Cir.1982); Consolidated Elec. Co. v. United States, 355 F.2d 437, 438 (9th Cir.1966). The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud. E.g., Hilton v. Mumaw, 522 F.2d 588, 595, 602 (9th Cir.1975).
 
 
 26
 Our review of the summary judgment record convinces us that there was a genuine dispute as to whether Beneficial had actual or constructive knowledge of the fraud in 1980. The Einhorn memorandum and the internal audit are sufficient to raise a question of whether Beneficial knew what was happening. Even if it did not, the record also suggests that Beneficial may not have investigated diligently. We do not require that any time a fraud victim has a meeting with a man on the other side, the victim must question him as to any activities that have aroused suspicion. In some instances, to do so would serve to alert the schemer and enable him to escape or to cover his tracks. In this case, though, there is evidence that Beneficial told Treash that it knew about the deals. In such an instance, the failure to follow up could be considered as evidence of a coverup or, at least, of a failure to investigate diligently. Beneficial's renegotiation of the overinflated contracts with Madariaga and Graham suggests that it did not have actual knowledge, but the company's failure to connect the "cloud" surrounding Treash with defendants' inflated rates leaves open an inference that more diligence could have been used. Thus, unless the statute was tolled, defendants are entitled to a trial on the knowledge issue.
 
 
 27
 Beneficial raises the equitable doctrine of fraudulent concealment as a tolling rationale. Under this doctrine, Beneficial has the burden of proving that defendants actively concealed their wrongdoing. Hennegan v. Pacifico Creative Serv., Inc., 787 F.2d 1299, 1302 (9th Cir.), cert. denied, 107 S.Ct. 279 (1986). If Beneficial carries this burden, defendants' actions provide a defense to a claim of constructive knowledge because these actions, by definition, prevented a reasonable person from discovering the fraud through the exercise of due diligence. Rutledge v. Boston Woven Hose & Rubber Co., 576 F.2d 248, 250 (9th Cir.1978); Sperry v. Barggren, 523 F.2d 708, 710-11 (7th Cir.1975). However, if Beneficial actually knew of the schemes in 1980, defendants' acts of concealment are no bar. Hennegan, 787 F.2d at 1302; Sperry, 523 F.2d at 710-11. Thus, if the district court finds on remand that Beneficial had actual knowledge, the action is barred regardless of any fraudulent concealment.
 
 
 28
 If the district court finds that Beneficial lacked actual knowledge during the limitations period but had constructive knowledge, then the court must address the fraudulent concealment claim. Among the evidence to be considered in this regard will be defendants' alleged money laundering system and their silence in negotiations with Beneficial. This evidence will have to be weighed against Madariaga's seemingly inconsistent contentions that he was not involved in the schemes and that he would have told Beneficial about the schemes had he been asked.
 
 II. INTENT TO DEFRAUD
 
 29
 Madariaga maintains that he had no intent to defraud Beneficial and was himself the victim of fraud by Treash. Graham maintains his innocence as well, charging that Madariaga and Treash conspired at his expense. The district court found, however, largely on the basis of testimony in Treash's criminal trial, that both were conscious participants.
 
 
 30
 We note preliminarily that the district court did not err in relying on defendants' earlier testimony. Under Federal Rule of Evidence 801(d)(2)(A), a statement is not hearsay if "it is offered against a party and is ... the party's own statement in either an individual or representative capacity." Such a statement is "excluded from the category of hearsay on the theory that [its] admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule." Fed.R.Evid. 801 advisory committee's note. Under this rule, Madariaga's testimony was admissible against Madariaga and Graham's against Graham.
 
 
 31
 These rules are sufficient to sustain the district court's findings because each defendant made ample statements implicating himself. Madariaga testified that he willingly participated in the kickback arrangement out of greed. Graham admitted to profiting from the scheme knowingly, and his testimony that he only agreed to participate "so long as it is an expense to the company" is not reasonably susceptible to the interpretation that he believed the kickbacks to be legitimate business expenses. At another point Graham testified that he "explained to Mr. Madariaga that our exposure was extremely high ..." In view of these admissions, we hold that defendants' declarations in this litigation do not raise a "genuine" issue of material fact. See Radobenko v. Automated Equipment Corp., 520 F.2d 540, 544 (9th Cir.1975).
 
 
 32
 III. THE DISCOVERY CUT-OFF: PREMATURE ADJUDICATION?
 
 
 33
 Both defendants claim that summary judgment was entered precipitously, thereby prejudicing their discovery efforts. They argue that further discovery would have provided more concrete evidence regarding Beneficial's knowledge for purposes of the accrual of the statute of limitations. Additionally, Graham claims that he was prejudiced by not being able to discover facts regarding Madariaga's side deal with Treash. The district court's refusal to permit further discovery is reviewed for abuse of discretion. Landmark Dev. Corp. v. Chambers Corp., 752 F.2d 369, 373 (9th Cir.1985) (per curiam).
 
 
 34
 There are both procedural and substantive reasons why the district court's decision to enter summary judgment was not an abuse of discretion. Procedurally, neither Madariaga nor Graham took the necessary step of "formally moving" for a continuance of discovery pursuant to Fed.R.Civ.P. 56(f). Brae Transp., Inc. v. Coopers & Lybrand, 790 F.2d 1439, 1443 (9th Cir.1986); Foster v. Arcata Associates, Inc., 772 F.2d 1453, 1467 (9th Cir.1985), cert. denied, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986). Graham's informal, oral requests to the court for more time to conduct discovery fell short of compliance with Rule 56. See Brae, 790 F.2d at 1443 ("References in memoranda and declarations to a need for discovery do not qualify as motions under Rule 56(f)").
 
 
 35
 In addition to the failure to comply with formal requirements, the court's decision did not amount to an abuse of discretion because defendants were not shortchanged on discovery. The length of time between defendants' appearances and the grant of summary judgment--about a year for Madariaga and more than six months for Graham--was more than sufficient to provide them with reasonable opportunities for discovery. Compare, e.g., Hall v. Hawaii, 791 F.2d 759, 760-61 (9th Cir.1986) (affirming grant of summary judgment despite claim that four months between filing of suit and dismissal was inadequate time for discovery). Moreover, both Graham and Madariaga wasted portions of their allotted time for discovery. "[T]he movant cannot complain if it fails to pursue discovery diligently before summary judgment." Brae, 790 F.2d at 1443; Frederick S. Wyle, P.C. v. Texaco, Inc., 764 F.2d 604, 612-13 (9th Cir.1985).
 
 
 36
 We hold, therefore, that the district court did not abuse its discretion in cutting off discovery. Nonetheless, we note that further discovery may be desirable or appropriate on remand in view of our reversal on statute of limitations grounds. We leave this to the discretion of the district court on remand.
 
 IV. DAMAGES
 
 37
 Graham challenges several aspects of the damages award. Among his arguments, the contention that the district court erred in awarding both treble damages under RICO and punitive damages under California law presents the toughest legal question. If the RICO cause of action is not barred by the statute of limitations and the district court is still inclined to award punitive damages in addition to the treble damages mandated by RICO, then that court should seriously address the question of whether such an award is permissible--specifically, whether RICO pre-empts punitive damage awards on pendent state claims based on the same underlying activity that gives rise to the RICO action.[7] See Alcorn County, Mississippi v. U.S. Interstate Supplies, 731 F.2d 1160, 1170 n. 16 (5th Cir.1984). We do not now express an opinion on as weighty and potentially far-reaching an issue as this since it is not squarely before us. We will address the punitive damages question if it presents itself in a second appeal.
 
 
 38
 We also express no opinion regarding Graham's other damages claims. Our resolution of the statute of limitations issue moots those questions on this appeal.
 
 CONCLUSION
 
 39
 We reverse the district court's grant of summary judgment on the statute of limitations question and remand for reconsideration of that issue. We affirm the summary judgment with respect to the intent to defraud issue. We affirm the district court's decision to cut off discovery, though we note that further discovery on the statute of limitations question may be desirable and is within the district court's discretion. We do not reach the damages questions.
 
 
 40
 REVERSED IN PART AND AFFIRMED IN PART.
 
 
 
 [1]
 The investigator did not file a written report; he only reported orally to Beneficial's management. In September, 1986 he declared that he had "only a vague recollection of the investigation."
 
 
 [2]
 The fourth co-defendant, Ronald Barker, allegedly laundered the bribes paid to Treash by having Madariaga and Graham deposit them into the accounts of two businesses Barker owned. Barker then wrote checks on those accounts to Treash's wife, who cashed the checks for her husband. Barker received a 5% commission for his money laundering services. He is now dead
 
 
 [3]
 The discovery conducted by Madariaga before Graham's appearance included two depositions, a request for documents, and the receipt of the transcripts from Treash's criminal trial
 
 
 [4]
 On June 27, 1986, the case was transferred from Judge Takasugi to Judge Tevrizian
 
 
 [5]
 Defendants do not appeal the summary judgment with respect to any of the substantive elements of the civil RICO action. To recover under 18 U.S.C. Sec. 1962(c), Beneficial was required to prove that its business or property incurred injury as a result of defendants' participation in the conduct of an enterprise through a pattern of racketeering activity. Because no interpretive questions with respect to RICO's substantive requirements are before us, we express no opinions with respect to such questions
 
 
 [6]
 The limitations periods for the state claims are not at issue
 
 
 [7]
 In this case, both the state claim for Fraudulent Misrepresentation and Concealment, on which the punitive damages award was based, and the RICO cause of action grew out of the same acts of misrepresentation and concealment. This case illustrates "the growing awareness of the ease with which common-law frauds [are being] transformed into RICO actions...." Note, Civil RICO and "Garden Variety" Fraud--A Suggested Analysis, 58 St. John's L.Rev. 93, 122 (1983); cf. Note, Civil RICO: The Temptation and Impropriety of Judicial Restriction, 95 Harv.L.Rev. 1101, 1104-05 (1982)