Guy R. DETRICK; Donna Detrick; Fast Forward, Incorporated, Plaintiffs–Appellants,

and

Northeast Container Corporation, Plaintiff,

v.

PANALPINA, INCORPORATED; Panalpina Air Freight, Incorporated; Multi–Modal Freight Systems, Incorporated; Multi–Modal Freight Systems Of Virginia; Sylvan Friedman, Defendants–Appellees,

and

American Motor Lines, Incorporated; Baltimore Freightways, Incorporated; Blue Star Freight Lines, Incorporated; General Motor Lines, Incorporated; Hagerstown Motor Express, Incorporated; Jennifer Motor Express, Incorporated; Maryland Transport And Storage Company; Mills Trucking, Incorporated; National Motor Lines, Incorporated; New Windsor Express, Incorporated;

South Carolina Motor Express, Incorporated; Tidewater Trucking Company, Incorporated; U.S. Motor Express, Incorporated; U.S. Transport Group; Vista Motor Express, Incorporated; John Does, 1–10, Defendants.

Guy R. DETRICK; Donna Detrick; Fast Forward, Incorporated, Plaintiffs–Appellees,

and

Northeast Container Corporation, Plaintiff,

v.

PANALPINA, INCORPORATED; Panalpina Air Freight, Incorporated, Defendants–Appellants,

and

Multi–Modal Freight Systems, Incorporated; Multi–Modal Freight Systems of Virginia; Sylvan Friedman; American Motor Lines, Incorporated; Baltimore Freightways, Incorporated; Blue Star Freight Lines, Incorporated; General Motor Lines, Incorporated; Hagerstown Motor Express, Incorporated; Jennifer Motor Express, Incorporated; Maryland Transport and Storage Company; Mills Trucking, Incorporated; National Motor Lines, Incorporated; New Windsor Express, Incorporated; South Carolina Motor Express, Incorporated; Tidewater Trucking Company, Incorporated; U.S. Motor Express, Incorporated; U.S. Transport Group; Vista Motor Express, Incorporated; John Does, 1–10, Defendants.

Nos. 95–2937, 95–3074.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 1996.

Decided March 18, 1997.

**ARGUED:** Robert Paul Stein, Camhy, Karlinsky & Stein, L.L.P., New York City, for Appellants. David K. Monroe, Galland, Kharasch, Morse & Garfinkle, P.C., Washington, DC, for Appellees. **ON BRIEF:** Martin E. Karlinsky, Allison J. Unger, Camhy, Karlinsky & Stein, L.L.P., New York City; Frank C. Razzano, Lisa E. Perry, Camhy, Karlinsky, Stein, Razzano & Rubin, L.L.P., Washington, DC, for Appellants. Andrew T. Goodson, Galland, Kharasch, Morse & Garfinkle, P.C., Washington, DC, for Appellees Panalpina; Max H. Lauten, Kramon & Graham, P.A., Baltimore, MD, for Appellees Multi–Modal and Friedman.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge NIEMEYER and Senior Judge HARVEY joined.

## OPINION

MURNAGHAN, Circuit Judge:

In April, 1990, Guy R. Detrick, Donna Detrick, and Fast Forward, Inc.,[1] abandoned their contract with Panalpina, Inc., and Panalpina Air Freight, Inc. (collectively, Panalpina), under which the Detricks provided warehouse services at Panalpina's Sterling, Virginia facility. The Detricks maintain that Panalpina, Multi–Modal, and Friedman conspired to force them to abandon the contract.

In their first amended complaint, the Detricks alleged various violations of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., and the Virginia conspiracy statute, Va.Code Ann. § 18.2–500 (Michie 1995). Subsequently, Panalpina counterclaimed against Guy and Donna Detrick alleging that the Detricks provided false invoices in breach of their contractual obligations to Panalpina, and that the Detricks willfully and maliciously conspired to injure Panalpina in its business, in violation of Va.Code Ann. §§ 18.2–499–500 (Michie 1995).

After the close of discovery, the district court granted summary judgment in favor of Panalpina, Multi–Modal, and Friedman on the grounds that the Detricks' RICO and Virginia state law claims were time-barred. On Panalpina's cross-claim, the district court also granted summary judgment in favor of the Detricks on the grounds that Panalpina had offered insufficient evidence that the Detricks breached their contractual obligations, and that Panalpina's conspiracy claim was barred by the intracorporate conspiracy doctrine. The Detricks and Panalpina now appeal. After careful consideration, we affirm

---

1. Multi–Modal Freight Systems, Inc., Multi–Modal Freight Systems of Virginia (collectively, Mul-ti–Modal) and Sylvan Friedman (Friedman) are also Appellees in the instant action.

in all aspects the decision of the district court.

I.

*FACTS AND PROCEDURAL HISTORY*

Guy R. Detrick and Donna Detrick are the sole stockholders of Fast Forward, Inc. (Fast Forward), and are majority stockholders of an affiliated corporation known as Northeast Container Corporation (Northeast). Panalpina, an international freight forwarder, arranges for the world-wide transportation of goods on behalf of its customers. Northeast and later Fast Forward, provided warehouse handling services for Panalpina in Herndon, Virginia and Sterling, Virginia, pursuant to informal understandings and later pursuant to written agreements dated October 24, 1988, and September 5, 1989. Pursuant to these agreements, the Detricks were Panalpina's primary warehouse service provider.

In November, 1988, Panalpina was awarded a substantial Foreign Military Sales Program (FMSP)[2] contract for the transportation of arms, weapons, and military equipment in connection with orders placed by the government of Turkey (Turkey or Turkish/FMSP). In Spring, 1989, the Detricks began to process the Turkish/FMSP freight moving through the Sterling warehouse.

At this same time, the relationship between the Detricks and Panalpina began to deteriorate as Panalpina began to demand discounts in fees charged by Fast Forward. In addition, Panalpina sought increases of staff, and insisted on "charging back" the Detricks for expenses not related to the warehouse contract. Panalpina also refused to lease additional space in the warehouse complex needed to accommodate the Turkish/FMSP contract.

As a result of Panalpina's actions, the Detricks' costs increased and the warehouse contract became unprofitable. As such, in April, 1990, the Detricks abandoned the warehouse contract. Contemporaneously, Friedman and Multi–Modal stepped in and using the former Northeast employees and assets Friedman had purchased from the Detricks, began to provide warehouse services to Panalpina at the Sterling site.[3]

In May, 1990, shortly after the Detricks abandoned the warehouse contract, Friedman hired Guy Detrick to work in a sales position at Multi–Modal at the Panalpina warehouse in Sterling; Multi–Modal also employed Donna Detrick on an hourly basis during the summer of 1990 to answer telephones and to perform light clerical work. On March 11, 1991, a former Fast Forward employee then employed by Multi–Modal approached Guy Detrick with an invoice containing an obvious billing discrepancy. Later that day, Detrick entered the copy room in the Panalpina warehouse, where he saw a stack of similar documents, including a freight bill "that looked like it had been done in a cheap print shop, that once again for the second time that day had the exact same information but a huge mark-up on the price." Upon further investigation, Detrick confirmed his suspicions that Friedman, Panalpina, and others were possibly engaged in an unlawful rebilling scheme, the object of which was to defraud the United States and foreign governments.[4]

**2.** The Arms Export Control Act, 22 U.S.C. § 2751 *et seq.*, and the Foreign Military Sales Authorizations Act, 22 U.S.C. § 2761 *et seq.*, provide for the sale of United States manufactured surplus military equipment to allied foreign governments and for related financial assistance in connection with such sales. The FMSP program, developed pursuant to the statute, is intended to support U.S. allies and to promote the interests of domestic weapons manufacturers. The program imposes on the purchasing country the responsibility to arrange for the shipment of armament, weapons, and military hardware from the United States. The cost of transportation, including freight forwarding, overland trucking, warehousing, and warehouse services within the United States is generally borne or reimbursed by the purchasing government, but in some cases the costs are reimbursed by the United States.

**3.** When Guy Detrick sought an explanation from Panalpina about Panalpina's demands, Kevin V. Hodgson, Vice President of Panalpina's Sterling Warehouse, told Detrick that Friedman offered to do the same work at lower rates.

**4.** Facts discovered since 1991, show that in 1988, Friedman and Multi–Modal, acting together with agents of Daniel F. Young, Inc. (D.F. Young), another freight forwarder, devised a "rebilling" scheme to defraud the United States and

Following the discovery of the alleged fraud, in March, 1991, the Detricks consulted counsel in an effort to determine whether they had sustained an injury for which the Detricks could sue. The Detricks also met with agents of the Internal Revenue Service (IRS), the Office of the Inspector General of the United States Department of State (OIG), and agents of the Federal Bureau of Investigation (FBI) and Defense Investigatory Service (DIS).[5]

On March 9, 1995, the Detricks filed the instant action in the district court alleging that the alleged rebilling scheme, operated by Panalpina, Multi–Modal, and Friedman violated RICO, 18 U.S.C. § 1961 *et seq.*, and the Virginia conspiracy statutes, Va.Code. Ann. § 18.2–500 (Michie 1995).[6] Panalpina filed a counterclaim alleging that the De-

tricks had (1) provided false invoices to Panalpina in breach of their contractual obligations to Panalpina; and (2) conspired willfully and maliciously to injure Panalpina in its business, in violation of Va.Code Ann. §§ 18.2–499 and 500.[7] At the close of discovery, Panalpina, Multi–Modal, and Friedman moved for summary judgment on two grounds: (1) the RICO and Virginia conspiracy claims were barred by the statute of limitations, and (2) the Detricks lacked standing with respect to the RICO and Virginia conspiracy claims.[8]

On October 26, 1995, the district court denied the motion on the standing ground, but granted summary judgment with respect to the statute of limitations ground. A day later, on October 27, 1995, the district court granted summary judgment in favor of the

---

foreign governments participating in the FMSP. Basically, the scheme involved the inflating of charges for inland freight and charging the foreign governments the inflated rate. The profits from the scheme were divided between D.F. Young and Multi–Modal, 60% and 40%, respectively. As the scheme continued, Friedman formed various shell entities for use in the scheme. The same rebilling scheme was employed on a FMSP contract with Egypt.

In the Spring of 1989, Friedman solicited Panalpina to join the rebilling scheme conspiracy, and the scheme expanded to include the Turkey/FMSP contract, with which Fast · Forward were involved. The profits from the inflated freight charges were divided between Panalpina and Multi–Modal, 60% and 40%, respectively. Thereafter, Friedman wanted Multi–Modal to receive more of the ill-gotten gains, and hence, decided that if Friedman could assume control of the warehouse operation presently operated by the Detricks, Friedman would be able to increase the amount of proceeds from the rebilling scheme. As a result, Friedman devised a plan to force the Detricks out of business by subsidizing below-competition rates and paying "kickbacks" to various Panalpina employees.

As the district court noted, all Panalpina's officers and employees who were involved in the rebilling scheme have invoked their Fifth Amendment privileges against self-incrimination.

5. Some time thereafter, Friedman entered a guilty plea on criminal charges relating to the rebilling conspiracy and employees of D.F. Young were convicted at trial with respect to the rebilling scheme. The investigation of Panalpina and its officers, agents, and employees continues.

6. In March, 1995, Guy Detrick also filed a *qui tam* action, pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, in the district court in

Alexandria, seeking to recover a monetary award for his role as a whistleblower in connection with the rebilling scheme. While Judge Ellis recognized the contribution made by Guy Detrick to the government's investigation, Judge Ellis concluded that Detrick did not possess the evidentiary details of the fraud to qualify for realtor status within the meaning of the False Claims Act. *United States of America ex rel. Guy Detrick v. Daniel F. Young*, 909 F.Supp. 1010 (E.D.Va. 1995). Detrick's appeal is currently pending in the Fourth Circuit.

7. According to Panalpina, in August, 1990, Guy and Donna Detrick, as individuals on behalf of Fast Forward, executed a contract with Panalpina for the provision of "classified" warehousing services for freight shipped by Panalpina on behalf of the governments of Turkey and the United Kingdom. As part of their obligations under the contract, the Detricks, on behalf of Panalpina arranged for classified freight to be shipped via air cargo. Sometimes, the Detricks would list themselves as consignee, and invoice Panalpina for reimbursement of the charges.

Panalpina claims that shortly after the Detricks' discovery of the alleged rebilling conspiracy, Panalpina began to receive multiple invoices from Fast Forward requesting reimbursement for the same shipping charges. These invoices disguised the charges for which payment was requested, and Panalpina paid the invoices without noticing that Panalpina had been falsely double-billed.

8. Previously, on July 7, 1995, the district court denied Panalpina, Multi–Modal, and Friedman's motion to dismiss the complaint without prejudice on statute of limitations and other grounds to allow the parties to proceed with relevant discovery.

Detricks on Panalpina's cross-claim finding that Panalpina had failed to present sufficient evidence to sustain its state law claims, and further, that the intracorporate doctrine barred Panalpina's conspiracy claim pursuant to Va.Code Ann. §§ 18.2–499–500.

## II.

The Detricks argue that the district court erred in dismissing their RICO and Virginia conspiracy claims. We now address the Detricks' contentions.

### A.

Before turning to the merits of the instant appeal, the court must address Guy and Donna Detrick's, and Fast Forward's Motion to Substitute the Detricks' bankruptcy Trustees, H. Jason Gold and Gordon P. Peyton for Guy and Donna Detrick as Appellants. Panalpina has filed an opposition to the substitution motion arguing that the substitution will unnecessarily complicate the instant appeal. Friedman and Multi–Modal have no opposition to the substitution.[9]

■ The Bankruptcy Code defines property of the debtor's estate to include "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). In *In re Richman*, 104 F.3d 654 (4th Cir.1997), the Fourth Circuit stated that "[a]s a general matter, in a Chap-

ter 7 proceeding, the trustee alone has standing to raise issues before the bankruptcy court and to prosecute appeals. A trustee is the representative of the bankrupt's estate and has the capacity to sue or be sued." *Id.* at 657. Moreover, the court noted that "[o]nce appointed, the trustee becomes the estate's 'proper party in interest, and the only party with standing to appeal the bankruptcy court's order.'" *Id.* citing *In re Eisen*, 31 F.3d 1447, 1451 n. 2. (9th Cir.1994); *see also Jones v. Harrell*, 858 F.2d 667, 669 (11th Cir.1988) (trustee in bankruptcy succeeds to all causes of action held by the debtor and debtor lacks standing to pursue those causes of actions); 11 U.S.C. § 323(a)[10] (trustee becomes the sole representative of the estate). In addition, the decision whether to pursue a claim or not is vested within the trustee's discretion. *See In re Louden*, 106 B.R. 109, 112 (Bankr. E.D.Ky.1989) ("It is the trustee and only the trustee who may, in the exercise of his sound judgment and discretion, attempt to reduce to judgment causes of action which are the property of the debtors' estate.") In exercising his/her judgment and discretion, the Trustee has three choices with respect to pending actions by the debtor: (1) intervene and assume prosecution as trustee, (2) consent to prosecution by the debtor for the benefit of the estate, or (3) decline prosecution. *See* 1 ROBERT E. GINSBURG & ROBERT D. MARTIN, GINSBURG & MARTIN ON BANKRUPTCY

---

**9.** On August 17, 1992, Donna C. Detrick filed a voluntary petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code, and on December 9, 1992, the Bankruptcy Court entered an order releasing Donna C. Detrick from all dischargeable debts. Subsequently, on May 12, 1993, Guy R. Detrick also filed a voluntary petition for bankruptcy under Chapter 7, and on September 3, 1993, the Bankruptcy Court entered an order releasing Guy R. Detrick from all dischargeable debts. The schedules listing assets and liabilities, and the statements of financial affairs, accompanying each of the Detricks' Chapter 7 bankruptcy petitions did not list the present cause of action, because the Detricks were not aware of their present 1992 and 1993 RICO and conspiracy claims.

On September 15, 1995, the Detricks voluntarily petitioned the bankruptcy court to reopen their cases so they could list the present cause of action, and their creditors could share in any proceeds from the present action. On October 10, 1995, the bankruptcy court entered an order

reopening Guy Detrick's bankruptcy; on October 12, 1995, the bankruptcy court reopened Donna Detrick's case stating that the cases should be reopened "to administer a legal cause of action on behalf of the estate." In addition, the bankruptcy court entered an order re-appointing H. Jason Gold and Gordon P. Peyton as Trustees of Guy and Donna Detricks' respective estates. The court also entered orders authorizing the retention of the debtors' attorneys as counsel for the Trustees for the purpose of pursuing the present action. *See* 11 U.S.C. § 327(e) ("The trustee, with the court's approval, may employ, for a specified purpose, ... an attorney that has represented the debtor, if in the best interest of the estate ...").

**10.** 11 U.S.C. § 323 provides:

(a) The trustee in a case under this title is the representative of the estate.

(b) The trustee in a case under this title has capacity to sue and be sued.

§ 12.06[G] (4th ed.1996); Fed.R.Bankr.Pro. 6009; *American Foods, Inc. v. Dezauche,* 74 F.Supp. 681, 682 (W.D.N.Y.1947).

■ As Panalpina noted before the district court, since the Detricks have filed for bankruptcy protection, the Detricks, in their individual capacities, lack standing to pursue the instant lawsuit, as the Detricks' claims now belong to the bankruptcy Trustees. The district court denied Panalpina's motion for summary judgment on the standing issue reasoning that "I am not going to dismiss this claim or grant summary judgment on this claim because of standing in this posture when the Bankruptcy Court has reopened it and they have entered an order that this counsel [Detricks'] shall continue and all." The district court, however, did not substitute the bankruptcy Trustees as plaintiffs. In addition, Panalpina argues that the Trustees may not be substituted as Appellants in the instant case because the Trustees were not substituted as plaintiffs before the district court, and the district court's entry of summary judgment was directed against Guy and Donna Detrick, and Fast Forward, Inc.

■ While no doubt exists that the bankruptcy Trustees did not file a motion to substitute as plaintiffs before the district court, by virtue of the Detricks' bankruptcy, the Trustees succeeded to the Detricks' RICO and conspiracy claims, and the Trustees' retention of the Detricks' counsel sufficiently evinced the Trustees' exercise of their discretion to allow the Detricks to pursue the present cause of action on behalf of the estate. As such, the judgment entered against the Detricks by the district court was a judgment entered on behalf of the Detricks' estate, not on behalf of the Detricks in their individual capacity. Accordingly, the Trustees may pursue the appeal of the district court's decision. Hence, we conclude that the motion to substitute the Trustees as appellants in the instant action should be granted.

**B.**

■ Turning to the merits of the appeal, the court reviews the district court's grant of summary judgment *de novo,* regarding the evidence in the same plenary manner and applying the same standard the district court applied. *Wagner v. Wheeler,* 13 F.3d 86, 90 (4th Cir.1993). Under this standard, all facts and inferences to be drawn from those facts must be viewed "in a light most favorable" to the nonmoving party. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). A mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment, rather the nonmoving party must demonstrate that there exists a genuine issue of material fact to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

### 1. RICO Claim

The RICO statute does not contain an express statute of limitations period for actions arising from either its civil or criminal enforcement provisions. In *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 156–57, 107 S.Ct. 2759, 2767–68, 97 L.Ed.2d 121 (1987), however, the United States Supreme Court held that claims arising under civil RICO shall be governed by a four-year statute of limitations.[11] Unfortunately for the courts of appeals and district courts throughout the country, the Supreme Court declined to decide when a claim under RICO accrues, "[b]ecause it is clear that [the Appellee's] RICO claims accrued within four years of the time the complaint was filed." *Agency Holding,* 483 U.S. at 156–57, 107 S.Ct. at 2767.[12]

---

11. Despite RICO's failure to provide a statute of limitations for criminal violations, the general five-year "catchall" federal criminal statute of limitations applies to "criminal RICO prosecutions only because Congress has provided such a criminal limitations period when no other period is specified." *Agency Holding,* 483 U.S. at 154, 107 S.Ct. at 2766.

12. While the Supreme Court did grant certiorari in *Grimmett v. Brown,* 75 F.3d 506 (9th Cir.), *cert. granted,* —— U.S. ——, 116 S.Ct. 2521, 135 L.Ed.2d 1046 (1996), presumably to address the accrual issue, recently the petition was dismissed as improvidently granted, *cert. dismissed,* —— U.S. ——, 117 S.Ct. 759, 136 L.Ed.2d 674 (1997).

■ The Supreme Court's lack of guidance on the accrual issue has generated a split amongst the federal courts of appeals and district courts.[13] The Fourth Circuit in *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir.1987), has adopted a theory of accrual known as the "injury discovery" rule. The injury discovery rule provides that a RICO claim accrues and the statute of limitations begins to run "when a plaintiff knows or should know of the injury that underlies his cause of action." *Id.* at 220; *see also Bausch v. Philatelic Leasing, Ltd.*, 728 F.Supp. 1201, 1206 (D.Md. 1989), *aff'd*, 34 F.3d 1066 (4th Cir.1994) (Table).

At the core of the instant controversy is the circuit's decision in *Pocahontas*. While purportedly not challenging the propriety of the "injury discovery" rule, the Trustees contend that the district court failed properly to apply the rule to the facts of the instant case. Specifically, the Trustees maintain that at the time of their abandonment of the warehouse contract in 1990, when the Detricks sustained an economic loss, the Detricks had no reason to know, and could not have possibly known that they had incurred any "injury that underlies their cause of action" within the meaning of civil RICO, 18 U.S.C. § 1964(c). The Trustees argue that the mere occurrence of economic loss does not trigger the statute of limitations, under the injury discovery rule adopted by the circuit in *Pocahontas* . Rather, the Trustees maintain that the plaintiff must have had knowl-edge, either actual or constructive, that such "injury" is related to or arises from at least one predicate act giving rise to a RICO violation.

·In *Pocahontas,* the plaintiff, a contract coal mining company and its sole stockholder, asserted antitrust and conspiracy claims under § 8 of the Clayton Act, 15 U.S.C. § 19, §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, § 1964 of RICO, 18 U.S.C. § 1964, and under state law. Each of these claims was based, *inter alia*, on allegedly illegal interlocking directorates between and among the defendants. The plaintiff alleged that the termination of its contract mining agreement on May 1, 1979 by the defendants, was part of a general conspiracy among the defendants to eliminate certain contract miners in order to monopolize the relevant coal market. When the plaintiff's contract was terminated on May 1, 1979, the plaintiff had no knowledge whatsoever of the corporate relationships and interlocking directorates upon which its RICO claim was based. Nor was the plaintiff aware that the termination of its contract was related to the defendants' conspiracy to violate the antitrust laws. The plaintiff was only aware that its contract had been terminated, and in turn, the plaintiff had suffered an economic loss therefrom. *Pocahontas,* 828 F.2d at 214.

Subsequently, from time to time, plaintiff inquired of the defendants about the low prices the defendants were paying for coal, to which the defendants responded that the low prices were a result of poor market condi-

---

**13.** The United States Courts of Appeals for the First, Second, Fifth, Seventh and Ninth Circuits follow the injury discovery rule of accrual. *See, e.g., McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464 (7th Cir.1992); *Rodriguez v. Banco Cent.,* 917 F.2d 664, 665–66 (1st Cir.1990); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir.1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989); and *Beneficial Std. Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274–75 (9th Cir.1988); *La Porte Constr. Co., Inc. v. Bayshore Nat'l Bank of La Porte*, 805 F.2d 1254, 1256 (5th Cir.1986). In contrast, the United States Courts of Appeals for the Eighth, Tenth, and Eleventh Circuits hold that a RICO claim accrues when the plaintiff discovers or should have discovered *both* his injury and the defendant's pattern of racketeering activity. *See, e.g., Granite Falls Bank v. Henrikson*, 924 F.2d 150, 154 (8th Cir.1991); *Bath v. Bushkin, Gaims,* *Gaines & Jonas,* 913 F.2d 817, 820 (10th Cir. 1990), *rev. on other grounds, Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 354 n. 1, 111 S.Ct. 2773, 2777 n. 1, 115 L.Ed.2d 321 (1991); and *Bivens Gardens v. Barnett Bank,* 906 F.2d 1546, 1554–55 (11th Cir. 1990), *cert. denied,* 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991). The Sixth Circuit in *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, (6th Cir.1992) acknowledged the injury discovery rule and the injury and pattern discovery rule, but concluded that under either rule plaintiff's RICO claim was time barred. The Third Circuit follows the last predicate act rule wherein the statute of limitations period restarts when the plaintiff knew or should have known of the last predicate act which is part of the same pattern of racketeering activity. *See Glessner v. Kenny,* 952 F.2d 702, 706 (3d Cir.1991).

tions. Only after searching through public records,[14] in early 1984, did the plaintiff learn of the interrelationships between the various defendants. In December, 1984, plaintiff filed suit. *Id.* at 215.

In affirming the dismissal of plaintiff's claim, the *Pocahontas* court held that plaintiff's RICO claim arose when plaintiff knew or should have known of the injury underlying its RICO cause of action. *Id.* at 220. The court also rejected as to both the RICO and antitrust claims, plaintiff's claim of fraudulent concealment. Thus, the court held that plaintiff's RICO claims were barred by the four-year statute of limitations.

The Trustees urge that the "injury discovery" rule adopted by the circuit in *Pocahontas* is a "knowledge-based rule" as "[i]t is not mere economic loss which marks the accrual of a RICO cause of action, but [the Detricks'] knowledge of facts and circumstances sufficient to put the plaintiff on inquiry notice and demonstrate some reasonable correlation between the loss and the RICO cause of action—only this connection signifies 'injury that underlies the cause of action.'" Trustees' Brief, at 18.

For support for their position, the Trustees tellingly rely on cases from other circuits. The Trustees argue that the application of the injury discovery rule by the Ninth Circuit in *Beneficial Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271 (9th Cir.1988), is fully consistent with the "knowledge based rule." In deciding whether to apply the accrual rule as announced in *Compton v. Ide,* 732 F.2d 1429, 1433 (9th Cir.1984), or the accrual rule used in antitrust cases, the Ninth Circuit chose to apply the knowledge-based *Compton* rule to the plaintiff's claims. Under the *Compton* "knowledge-based rule", plaintiff's suit would be barred if the plaintiff "knew or should have known about its *claims* within the four-year RICO statute of limitations period." *Beneficial,* 851 F.2d at 275 (emphasis added).[15] Further, the court stat-

ed that "the statute of limitations period accrued when [the plaintiff] had actual or constructive knowledge of *the fraud...*" *Id.* (emphasis added).

In our view, the Ninth Circuit's application of the injury discovery rule requires the plaintiff's knowledge, either actual or constructive, of the underlying fraud, in addition to the injury for which the plaintiff is seeking compensation. Throughout the Ninth Circuit's discussion of the accrual time of RICO claims, the court refers to the plaintiff's knowledge of its claims, or the underlying fraud. Since the court was aware that under the antitrust accrual rule, the statute of limitations is triggered by the date of the injury alone, the Ninth Circuit's injury discovery rule is more akin to the circuits that require that the plaintiff know both of his injury and the pattern of racketeering which serve as a basis for his RICO action.

The Trustees also rely upon an unpublished district court decision from New York, *Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Securities Corp.,* [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,026, 1992 WL 204374 (S.D.N.Y. Aug. 11, 1992).[16] In that case, plaintiffs asserted RICO claims arising out of their investments in limited partnerships in which plaintiffs' tax losses were disallowed because of fraudulent misconduct on the part of various agents of the partnerships. In moving to dismiss plaintiffs' claims on the basis of the statute of limitations, the defendants argued that because of prior dissemination of adverse public disclosure regarding problems with investments, plaintiffs knew or should have known of the alleged fraud before March 25, 1987. In contrast, the plaintiffs urged that their RICO claims did not accrue until October 27, 1987, when some of the plaintiffs learned of the existence of secret agreements between and among the defendants relating to the alleged fraud, or until December, 1987, when

---

**14.** These records included land title documents and mining applications at the West Virginia and Kentucky state mine agencies, and the defendants' annual reports.

**15.** The *Beneficial* court noted, however, that in antitrust actions "the plaintiff's knowledge is

generally irrelevant to accrual, which is determined according to the date on which the injury occurs." *Id.* at 275.

**16.** 1992 WL 204374 (S.D.N.Y. Aug.11, 1992).

certain of the individual defendants were convicted of tax fraud.

Applying the "injury discovery" rule the district court held that plaintiffs' RICO claims accrued as a matter of law on "March 25, 1987, when [the defendant's] indictment became public," which was the earliest date on which the plaintiffs knew or should have known of "the fraudulent scheme which is the basis for the claims here." [17]   *Id.* at 94,523. The court emphasized that at the time the plaintiffs had suffered their investment losses, they had no knowledge of defendants' fraudulent scheme. The district court stated:

> Here, although plaintiffs knew by 1985 that they had suffered losses in their investments in Groups, they cannot be charged as a matter of law with knowledge then that the losses were actually 'racketeering injuries' (caused by defendants' racketeering acts) within the meaning of *Bankers Trust.*[18]

*Id.* at 94,522. The *Dayton* court stated "plaintiffs first learned of defendants' racketeering acts and later discovered that they were injured by those acts ... immediately after plaintiffs learned of their RICO injury, they had all the information necessary to bring RICO actions, because they already knew of defendants' racketeering acts." *Id.* at 94,522.[19]

Thus, following the *Beneficial* and *Dayton* courts' application of the knowledge-based injury discovery rule, the Trustees argue that the district court should be reversed because until March 11, 1991, when the former Fast Forward employee showed Guy Detrick the false shipping invoice, the Detricks had no knowledge whatsoever of the alleged fraudulent activities which formed the basis for the Trustees' RICO claims. Trustees' Brief, at 22.

The Trustees' argument is problematic for a number of reasons, not the least of which is the Trustees' reliance on non-binding authority. Despite the fact that the Trustees maintain that they are not challenging the propriety of the injury discovery rule, the Trustees are doing precisely just that. Seemingly, the Ninth Circuit has read the term injury to require that the plaintiff know or have constructive knowledge of the racketeering activity which forms the basis for the RICO claim. The *Dayton* court also applied the injury discovery rule in a like manner. In that case, the district court held, apparently in contravention of *Bankers Trust,* that the plaintiff must have knowledge of the injury, as well as, the defendants' racketeering acts, before the RICO cause of action begins to accrue, and the statute of limitations begins running. Both the *Beneficial* and *Dayton* courts speak in terms of the plaintiff's claim, not injury, and as such have interpreted the term "injury" for RICO purposes to encompass the actual injury and the cause of action.

In *Pocahontas,* the circuit stated that "the statutory period begins to run when a plaintiff knows or should know of the *injury* that underlies his cause of action." *Pocahontas,* 828 F.2d at 220. Tellingly, the court's holding recognizes the distinction between the injury and the cause of action. The *Pocahontas* plaintiff urged that it did not discover

---

**17.** The district court rejected the defendants' arguments that dissemination of adverse public information regarding the limited partnerships in which plaintiffs invested their money, and the IRS deficiency notices constituted sufficient inquiry notice to plaintiffs of their injury.

**18.** In *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989), the Second Circuit adopted a rule of separate accrual which provides that "each time a plaintiff discovers or should have discovered an injury caused by defendant's [RICO] violation, a new cause of action arises as to that injury, regardless of when the actual violation occurred." *Id.* at 1102.

**19.** In their reply brief, the Trustees rely on *Bontkowski v. First Nat'l Bank,* 998 F.2d 459 (7th Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993), for support of its knowledge-based rule. In that case, the Seventh Circuit reiterated its injury discovery rule, and held that the plaintiff's claim was time-barred. In *Bontkowski,* the plaintiff argued that he was unaware that the defendant had committed wire fraud on him until 1988, and hence, his lawsuit filed in 1991 was timely. The court of appeals disagreed concluding that at the earliest the plaintiff should have been aware of his injury in 1982, when the defendant called his loan in, or at the latest, in 1984 when the plaintiff and others were indicted. Thus, the court concluded that the plaintiff's RICO claims were time-barred.

until early 1984, the interrelationships amongst the defendants that formed the bases for the RICO claims. Nevertheless, the court concluded that the plaintiff's "injury" occurred in May 1979, when plaintiff's contract was terminated, and since the suit was filed in December 1984, the suit was time-barred.

■ Nothing in the *Pocahontas* case suggests that the circuit intended the "injury" to refer to both the actual injury as well as the plaintiff's discovery of the defendant's racketeering acts.[20] The Trustees' attempt to distinguish *Pocahontas* on the grounds that the information in *Pocahontas* was publicly available, and thus, the plaintiffs knew or should have known that they had suffered an injury arising out of and connected to misconduct, Trustees' Brief, at 18 n. 11, is equally unavailing. Other than during the recitation of the facts, and in the court's discussion of the fraudulent concealment claim, the court did not mention that the public nature of the information played any role in determining when the statute of limitations began to run.[21]

■ Furthermore, the adoption of the Trustees' proposed rule would be directly contrary to *Pocahontas*.[22] The Detricks' injury occurred in April, 1990, when the Detricks abandoned their warehouse contract with Panalpina. The Detricks discovered the alleged fraud on March 11, 1991. Thereafter, the Detricks filed the instant suit on March 9, 1995. A straightforward application of the rule adopted in *Pocahontas* provides that the four-year statute of limitations began to run in April 1990, the date of the injury. Hence, the district court correctly concluded that the Trustees' claims, filed in 1995, were time-barred.

### 2. Fraudulent Concealment

As a fallback argument, the Trustees argue that even if the injury occurred in April, 1990, and hence, the statute of limitations would bar any claims after April, 1994, the statute of limitations should be tolled until March 11, 1991, the date of Guy Detrick's

20. Other courts which apply the injury discovery rule do not require knowledge of the underlying cause of action before the statute of limitations begins to accrue. In fact, in *McCool v. Strata Oil Company*, 972 F.2d 1452 (7th Cir.1992), the Seventh Circuit expressly rejected the accrual rule adopted in other circuits which require both knowledge of the injury and the cause of action before the statute of limitations begins to run on RICO claims. *McCool* held that "a RICO claim accrues when the plaintiff discovers her injury, *even if she has not yet discovered the pattern of racketeering.*" *Id.* at 1464. (emphasis added). Moreover, the court recognized that "an important distinction" exists "between discovery of an injury and discovery of a cause of action." *Id.*; *see also United States v. Kubrick*, 444 U.S. 111, 123, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979) (action under Federal Tort Claims Act "accrues" on discovery of injury, not on discovery of negligence).

Similarly, the First Circuit, in *Rodriguez v. Banco Central, et al.*, 917 F.2d 664 (1st Cir.1990), relying on the *Bankers Trust* case, held that a RICO cause of action begins to accrue "at the time a plaintiff knew or should have known of his injury." *Id.* at 665.

21. In addition, the circuit's decision, in *Bausch v. Philatelic Leasing, Ltd.*, 728 F.Supp. 1201, 1206, *aff'd*, 34 F.3d 1066 (4th Cir.1994), reiterated the injury discovery rule developed in *Pocahontas*. In that case, the United States, in June 1983, filed suit against the defendants alleging that the stamp master scheme which defendants sold to the plaintiffs was an abusive tax shelter. Plaintiffs did not dispute that they were told about the existence of the lawsuit. As a result, the plaintiffs asked the defendant who had sold them the scheme, and based on his assurances that they had nothing to worry about, did nothing. Similarly, plaintiffs, again, accepted the defendant's assurances when the IRS sent them deficiency and penalty notices.

The district court found that the fraudulent concealment doctrine was unavailable to the plaintiffs because of the inadequacy of the plaintiffs' investigation once placed on notice of the IRS lawsuit, and their receipt of the IRS notices. Thus, the district court held, and the Fourth Circuit affirmed, that the plaintiffs' RICO claims accrued as of June 1983, the filing date of the IRS challenge. Therefore, the plaintiffs' lawsuit, filed in 1988, was time-barred.

22. While not addressed in *Pocahontas*, the policy reasons underlying the adoption of a discovery rule predicated on the discovery of the injury, and not also the cause of action, stems from the courts' recognition that statutes of limitations serve to prevent the litigation of stale claims. *See, e.g. Gould v. U.S. Dept. of Health & Human Services*, 905 U.S. 738, 741 (4th Cir.1990), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 673, 112 L.Ed.2d 666 (1991) ("right to be free in time comes to prevail over the right to prosecute them").

discovery, based upon the equitable doctrine of fraudulent concealment.

The purpose of the fraudulent concealment doctrine is "to prevent a defendant from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until' the defendant 'could plead the statute of limitations to protect it.'" *Supermarket of Marlinton v. Meadow Gold Dairies*, 71 F.3d 119, 122 (4th Cir.1995) (Marlinton). Furthermore, "when the fraud has been concealed or is of such a character as to conceal itself, and the plaintiff is *not negligent or guilty of laches,* the limitations period does not begin to run until the plaintiff discovers the fraud." *Id.* at 122. A party seeking to invoke the doctrine of fraudulent concealment must demonstrate that "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." [23] *Id.*

Initially, we must address by what standard do the Trustees have to demonstrate the existence of the first prong. In *Marlinton,* a price-fixing case, the Fourth Circuit addressed the differing standards for determining whether antitrust plaintiffs have satisfied the first element of the fraudulent concealment doctrine. After weighing the pros and cons of the "self concealing" [24] standard, the "separate and apart" [25] standard, and the intermediate "affirmative acts" standard, the court ultimately held that the intermediate affirmative acts standard should be applied because "price-fixing is not inevitably deceptive or concealing", *Marlinton,* 71 F.3d at 123, and the intermediate affirmative acts standard "would permit the courts to avoid the difficult, if not impossible, task of deciding which acts are in furtherance of conspiracies and which acts are separate and apart from conspiracies." *Id.* at 125.

Thus, the court held that to satisfy the first element of the fraudulent concealment doctrine, the plaintiff must "provide evidence of affirmative acts of concealment by [the defendant]. Those acts, however, need not be separate and apart from the acts of concealment involved in the antitrust violation; rather, [the plaintiff's] proof may include acts of concealment involved in the alleged antitrust violations itself." *Id.* at 126.[26]

The issue the Trustees raise is not novel, in fact, the *Pocahontas* court addressed the precise issue. In that case, the plaintiffs sought to avoid the bar of the statute of limitations, on their antitrust and RICO claims, by similarly drawing on the doctrine of fraudulent concealment. Plaintiffs claimed that (1) the existence of the interrelationships among the defendant companies, and (2) the defendants' specific activities undertaken pursuant to the conspiracy, such as boycotts, suspensions, systematic terminations of contract miners, delivery quotas, and related manipulative and deceptive practices, were concealed from the plaintiffs, and hence, the statute of limitations should be tolled by the fraudulent concealment doctrine. The district court disagreed.

In affirming the district court, the Fourth Circuit noted that the district court "[p]rop-

---

23. The Supreme Court has stated that the fraudulent concealment doctrine is to be "read into every federal statute of limitation." *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946).

24. The self-concealing standard is only proper when deception or concealment is a necessary element of the antitrust violation. *Id.* at 123. Under the self-concealing standard, the plaintiff satisfies the first element of the fraudulent concealment doctrine by "merely proving that a self-concealing antitrust violation has occurred." *Id.* at 122.

25. Under the separate and apart standard, the plaintiff is required to provide evidence, separate and apart from the acts of concealment involved in the antitrust violation, that the defendants affirmatively acted to conceal the plaintiff's claim. *Id.* at 122.

26. Other circuits have also held that affirmative acts in furtherance of the conspiracy provide sufficient evidence of fraudulent concealment to establish the first element of the fraudulent concealment test. *See Conmar Corp. v. Mitsui & Co.,* 858 F.2d 499, 505 (9th Cir.1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); *Pinney Dock & Transport Co. v. Penn Central Corp.,* 838 F.2d 1445, 1472–74 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988).

erly [took] into account the indisputable fact that any structural interrelationship between the corporate defendants was necessarily discoverable upon simple inquiry and consultation of public records...." *Pocahontas,* 828 F.2d at 218. Furthermore, the court rejected, as the district court had, the plaintiffs' averments that the defendants employed techniques of secrecy to avoid detection of the combination and conspiracy. The court noted that the plaintiffs' general inquiry as to why the defendants were able to accept deliveries of coal at such a low price, and the defendants' false answer that market conditions dictated the low price, was insufficient to establish the fraudulent concealment. The court stated that

> [t]o permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct upon this sort of timid inquiry would effectively nullify the statute of limitations in these cases. It can hardly be imagined that illegal activities would ever be so gratuitously revealed.

*Id.* at 218–19.[27]

As the *Marlinton* court noted, the *Pocahontas* court did not employ any of the standards outlined in *Marlinton,* which of course, is not surprising given that neither party argued for the adoption of any standard, and the case law had not been developed on that issue in the Fourth Circuit. *Marlinton,* 71 F.3d at 124. Hence, while the instant case does not involve antitrust violations the intermediate affirmative acts standard adopted in *Marlinton* would apply in the instant case. As in the price-fixing case involved in *Marlinton,* the alleged unlawful rebilling scheme does not require secrecy as an element of their RICO claims. Thus, for the Trustees to prevail, they must come forward with evidence, that as part of the alleged rebilling scheme, Panalpina, Multi–Modal, and Friedman committed affirmative acts which concealed their conduct from the Detricks.

Here, the Trustees argue that the defendants' activities of (a) the creation of dummy corporations which had no employees and conducted no business, (b) the use of false addresses to obtain carrier authorizations from the Interstate Commerce Commission, (c) the fraudulent re-billing through false freight bills for non-existent freight brokerage activity, (d) the fraudulent inflation of invoices in connection with truck brokerage activity, (e) the payment of substantial bribes to officers and employees of Panalpina, and (f) the deposit of checks received from those criminal activities in numerous bank accounts which were opened in order to insulate these criminal activities from discovery all demonstrate Panalpina, Multi–Modal, and Friedman's fraudulent concealment of its rebilling scheme from the Detricks.

Moreover, the Trustees argue that the instant case involved no public filings, no press releases, or any other public information from which the Detricks could have discovered the alleged illegal activities of Panalpina, Multi–Modal, and Friedman. Thus, the Trustees maintain that no information, whatsoever, was available to them to place them on inquiry notice or require them to proceed with a reasonable and diligent investigation into the alleged fraudulent conduct, until at the earliest March 11, 1991.

The district court concluded that the Trustees' evidence was lacking. The district court noted that Multi–Modal hired the Trustees and provided them with access to the warehouse, and ostensibly, to the fraudulent invoices. The district court rejected the Trustees' fraudulent concealment claim concluding that the Trustees "presented no evidence of any acts of fraudulent concealment, but rather present[ed] evidence that Panalpina hired and put the [Detricks] in the very warehouse where they would have access to the records they claim were needed to discover the fraud." Order, at 2.

In order for the Trustees to succeed on a fraudulent concealment claim, they must demonstrate that Panalpina, Multi–Modal,

---

27. While the court's discussion of the fraudulent concealment claims was addressing the plaintiff's Sherman Act claims, the court later held that the plaintiff's fraudulent concealment claim within the RICO context was "as unavailing here as it was for the Sherman Act claims, for the same reasons discussed in connection with those claims." *Pocahontas,* 828 F.2d at 220.

and Friedman engaged in some affirmative acts from April, 1990 to March 11, 1991, to conceal the alleged fraud. The district court concluded that the Trustees failed to demonstrate any such affirmative acts. We agree.

### 3. Virginia Conspiracy Claim

The Trustees also sought relief under the Virginia conspiracy statute, Va.Code Ann. § 18.2–500 (Michie 1995) for their injuries. The Trustees claim the district court erred in concluding that their claims were barred by the statute of limitations.

■ The statute of limitations applicable to the conspiracy claim is five years. Va. Code Ann. § 8.01–243 (Michie 1995). A cause of action under the conspiracy statute accrues at the time the Detricks first suffered any damages resulting from the acts committed in furtherance of the conspiracy. *Eshbaugh v. Amoco Oil Co.*, 234 Va. 74, 360 S.E.2d 350 (1987). As the Virginia Supreme Court stated in *Stone v. Ethan Allen, Inc.*, 232 Va. 365, 350 S.E.2d 629 (1986)

> where an injury, though slight, is sustained in consequence of the wrongful or negligent act of another and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act should have been sustained at the time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.

*Id.* 350 S.E.2d at 632; *see also International Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 129 (4th Cir.1988) ("In Virginia, only the slightest injury is required to start the running of the limitations period ... It is of no consequence that

the amount of damages [is] not ascertainable until a later date.")

Again, the dispute between the parties centers on when the statute of limitations began to run. The Trustees maintain that the conspiracy claim accrued, at the earliest, in April 1990, when the Detricks abandoned the warehouse contract. Panalpina, Multi–Modal, and Friedman argue, and the district court found, that the Detricks were injured by Panalpina's "insistence that they lower rates and increase staffing levels ... in early 1989 at the latest." Order, at 3.

■ The gravamen of the Trustees' argument is that since the object of the alleged conspiracy was to force the Detricks to abandon their warehouse contract, and because termination of that contract is the injury for which the Trustees seek compensation, the statute of limitations did not commence until April 1990, when the Detricks abandoned their contract.[28] Moreover, the district court also properly concluded that the Trustees' argument flies in the face of well-established Virginia law as to when the statute of limitations begins to run. The Trustees do not challenge that in late 1988, and in early 1989, Panalpina demanded that the Detricks lower their rates and increase staffing at the warehouse. Hence, the Detricks' initial injury, albeit slight, occurred in early 1989 at the latest, and culminated in April 1990. Virginia law is clear that the statute of limitations begins to run, when any injury occurs, and thus, the district court properly concluded that the statute of limitations began to run in 1989, and consequently, the Trustees' lawsuit filed in March, 1995 was time barred by the five-year statute of limitations.[29]

---

28. The Trustees also argue that genuine issues of material facts exist with respect to "which of the [Panalpina, Multi–Modal and Friedman's] acts harmed them, when they occurred, and what injury resulted." Trustees' Brief, at 30. The Trustees' argument is not persuasive. While true that the Detricks abandoned the warehouse contract in April 1990, the Trustees' argument attempts to ignore the fact that the Detricks' abandonment of the contract resulted from a culmination of the alleged conspiracy to force such abandonment. Since the contract was abandoned in 1990, the events leading up to that termination obviously had to occur before that date, and as such, the statute of limitations could

not have begun to run in April 1990. Thus, the district court correctly concluded that no genuine issues of material fact existed with respect to the Trustees' position.

29. The Trustees also argue that the district court's finding that for purposes of the RICO statute, the Detricks' injury occurred in April 1990, and for purposes of the Virginia conspiracy claim, the Detricks were injured in 1989 at the latest, is inherently inconsistent. The Trustees' argument fails to take into consideration the different statute of limitations; RICO's four-year and Virginia's five-year. As such, the district court for RICO purposes did not need to decide

## III.

On its cross-appeal, Panalpina argues that the district court erred in dismissing Panalpina's breach of contract and Virginia conspiracy statute counterclaims. Finding no error, we affirm. We now address each of Panalpina's counterclaims.

### A. BREACH OF CONTRACT CLAIM

■ To establish a cause of action for breach of contract, Panalpina must demonstrate that (1) the Detricks had a legal obligation to Panalpina; (2) the Detricks violated that right or duty; and (3) Panalpina was injured as a result of the breach. *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 379 S.E.2d 316, 318 (1989).

■ Panalpina argues that the invoices submitted by Panalpina provide ample support for Panalpina's breach of contract claim. Panalpina contends that the invoices provide substantial evidence that the Detricks sought double or triple reimbursement for invoices Panalpina had already paid. In contrast, the Detricks argue that none of the materials submitted by Panalpina satisfied the admissibility requirements of Fed.R.Civ.P. 56(e) because each of Panalpina's employees and officers refused to testify about the invoices, instead each officer and employee invoked their Fifth Amendment privileges. Thus, the Detricks argue that these documents unaccompanied by any testimony or other admissible evidence necessary to demonstrate their authenticity or an exception to the hearsay rule should be rejected. Moreover, the Detricks submitted the affidavit of Donna Detrick flatly denying that the Detricks had overbilled Panalpina for any charges.

The district court, in our view, properly concluded that Panalpina had presented no evidence from which a reasonable jury could find a breach of contract. District Court Order, October 27, 1995, at 1. Panalpina's invoices, standing alone, fail to demonstrate that any overbilling has occurred, and hence, the district court's decision is affirmed.

### B. CONSPIRACY CLAIM

■ In addition, the district court concluded that Panalpina's conspiracy claim was barred by the intra-corporate immunity doctrine. The intracorporate immunity doctrine provides that a conspiracy can not exist between the agents of a corporation and the corporation itself. *Griffith v. Electrolux Corp.*, 454 F.Supp. 29, 32 (E.D.Va.1978). A well-established exception, however, exists to the doctrine, namely, when the parties have "an independent personal stake" in the conspiracy. *Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir.1974).

■ Panalpina argues that the exception to the doctrine applies in the instant case because the Detricks signed the warehouse contract in their individual capacity.[30] Moreover, Panalpina contends that the Detricks have sued in their individual capacities, and not on behalf of Fast Forward. Thus, Panalpina argues that the Detricks "had an 'independent personal stake' in the conspiracy which is separate and apart from Fast Forward's interest." Appellees' Brief, at 36.

The district court concluded that Panalpina had merely alleged a "conspiracy among the corporation and officers of that corporation and a corporation cannot conspire with itself." Order, at 2. We concur.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

whether the Detricks' earlier 1989 injuries triggered the statute of limitations, because the Detricks' April 1990 injury was well before the four year statute of limitations. The same analysis, however, would not apply for the five year statute of limitations with respect to the conspiracy claim, and as such, the district court needed to address the Detricks' earlier injuries to determine the timeliness of the Trustees' claim. Rather than demonstrating an inconsistency, the district court's order reflects the court's correct application of different statutes of limitations periods.

**30.** The Detricks note that a review of the warehouse contract demonstrates that the Detricks signed in their capacity as owners of the corporation, and that the corporation itself was designated as the contractor.